S. S. & O. CORPORATION, A NEW JERSEY CORPORATION, PLAINTIFF-APPELLANT, v. TOWNSHIP OF BERNARDS SEWERAGE AUTHORITY, A BODY CORPORATE AND POLITICAL SUBDIVISION OF THE STATE OF NEW JERSEY, DEFENDANT-RESPONDENT.

Argued November 21, 1972—Supplemental Material Filed November 27, 1972 and December 7, 1972—Decided March 14, 1973.

*Mr. Frank T. Swain* argued the cause for appellant (*Messrs. Snevily, Ely, Williams & Swain,* attorneys).

*Messrs. Anthony P. Kearns and William J. Kearns* argued the cause for respondent (*Mr. Anthony P. Kearns,* attorney; *Messrs. William J. Kearns and Mahlon H. Ortman,* on the brief).

The opinion of the Court was delivered by

LEWIS, P. J. A. D., Temporarily Assigned. On January 15, 1970 plaintiff S. S. & O. Corporation (Developer), a real estate development company, filed a complaint against defendant Township of Bernards Sewerage Authority (Authority) by which it sought repayment of $37,800 paid for 42 sewerage connection charges pursuant to an agreement dated May 17, 1966, which was allegedly executed under duress and coercion exercised by the Authority. The complaint also sought a determination that the rate schedule, rules and regulations of the Authority as applied to newly constructed houses in plaintiff's development were arbitrary and illegal and that the utility should be enjoined from demanding payment of a $900 initial sewerage connection charge with respect to each of the remaining lots in the development upon which residential structures were to be erected. The Authority answered the complaint denying any unlawful practice and asserted that plaintiff's suit was barred by laches and estoppel; it also counterclaimed for money damages and injunctive relief to prevent further construction in plaintiff's development because Developer breached its agreement.

The trial court, after a nonjury trial, entered judgment dismissing with prejudice the complaint and the counterclaim. On Developer's appeal the judgment was affirmed by the Superior Court, Appellate Division, subtantially for the reasons expressed by the trial judge. The Authority did not cross appeal. This court granted certification, 60 *N. J.* 515 (1972).

It appears from the record that the Authority was created by a 1956 ordinance of the Township of Bernards pursuant to the provisions of *N. J. S. A.* 40:14A-1 *et seq.* Its first treatment plant went into operation about 1959 and thereafter, within a substantial portion of the municipality, sewer services were made available and furnished in accordance with the terms of an agreement executed in 1961 between the Authority and the township. At the time of trial (March

1971) 1823 of the 3044 homes listed on the township tax rolls were connected to the sewerage facilities.

The schedule of rates and the rules and regulations of the Authority revised in 1965, as amended April 13, 1966, classifies the users of its services into six classes, *i. e.*, dwellings, retail businesses, public buildings, private sewers, commercial and industrial uses and developments. The "initial charge" applicable to single-family dwellings (class one) is $700 plus an "annual charge" of $65. With respect to developments (class six) the pertinent provision reads:

The owner or developer of any development or subdivision of land for residential purposes, as defined by the statute, shall in addition to the requirements for the payment of fees for permits and engineering services pay, for each lot or tract of land therein, whereon a single dwelling house is built or intended to be built, an initial charge of $900.00 and an annual charge of $65.00. The owner or developer shall pay all costs and expenses for the installation of sewers, with the equipment and appurtenances thereof, within the development and in streets abutting the same.

In February 1966 Developer acquired title to certain tracts of farm land in the Township of Bernards for the intended purpose of subdivision into building lots and the construction of 72 single-family houses. Major subdivision approvals were obtained from the appropriate municipal agencies in April 1966 and February 1967. As a condition thereof plaintiff was required to enter into a written agreement with the Authority providing for the installation of adequate sewerage facilities. A proposed agreement, dated May 5, 1966, was prepared by the Authority and submitted to the Developer for signature. Provisions were included therein for various permit fees, a $580 deposit for review of the Developer's plans by the Authority engineer, a deposit of $660 for inspection of sewerage installation work in the development and the payment of a $900 connection fee upon the issuance of a certificate of occupancy for each house connection. Additionally, the Developer was required to install at its expense underground street sewer lines, or

"laterals," throughout the development. The agreement further provided:

> * * * Upon completion by the Developer and acceptance by the Authority of any such interceptor, lateral, branch sewer main, sewer pipe, or extension or part thereof, or apparatus or equipment or other works built by the Developer, the same and all easements and rights of way wherein or whereon built shall be turned over and conveyed by the Developer to the Authority, free and clear of all encumbrances, mortgages or other liens.

The Developer signed the agreement and returned it with a letter stating that the contract was executed "under protest, without waiving any of the rights of the Developer to challenge the validity of the charges that he is required to pay pursuant to the subject Agreement." The Authority's attorney replied advising that the protest letter was considered a repudiation of the proposed terms and that the Authority would "require an agreement, without reservations on the side." The next day the Developer was informed by letter that the Authority was canceling the three previously-issued permits authorizing sewer constructions.

On May 17 the Developer was furnished with a list of the requirements prerequisite to the issuance of necessary permits. The schedule, among other items, called for a new contract, "same as originally proposed," and a corporate resolution by the Developer containing a statement that no compulsion or coercion was used by the Authority and that any contract between the parties was entered into freely and voluntarily. On the same day a new agreement without any reservation was signed by the Developer and delivered to the Authority accompanied by a certified copy of a resolution adopted in conformity with the demands which had been made.

The instant suit, for the relief noted above, was commenced after the Developer had substantially completed the installation of a sewerage system within its development, connected 42 houses thereto and paid connection fees total-

ing $37,800. The challenged action of the Authority and the issue of enforcement of its rate structure necessitates an interpretation of applicable statutory language.

The Legislature has enacted a Sewerage Authorities Law, *N. J. S. A.* 40:14A–1 *et seq.* (*L.* 1946, *c.* 138), by which it declared that municipalities are empowered to establish authorities and to provide sewerage services in order to promote by all reasonable means the public policy of the State against pollution. *N. J. S. A.* 40:14A–2. Among the powers expressly vested in a municipal Sewerage Authority is the right "to charge and collect rents, rates, fees or other charges" as governed by *N. J. S. A.* 40:14A–8. This section was supplemented by *L.* 1968, *c.* 317, § 2 (effective October 7, 1968) amending *N. J. S. A.* 40:14A–8(b) to read as follows:

(b) ~~Such rents~~ *Rents*, rates, fees and charges, *which may be payable periodically*, being in the nature of use or service charges, shall as nearly as the sewerage authority shall deem practicable and equitable be uniform throughout the district for the same type, class and amount of use or service of the sewerage system, and may be based or computed either on the consumption of water on or in connection with the real property, making due allowance for commercial use of water, or on the number and kind of water outlets on or in connection with the real property, or on the number and kind of plumbing or sewerage fixtures or facilities on or in connection with the real property, or on the number of persons residing or working on or otherwise connected or identified with the real property, or on the capacity of the improvements on or connected with the real property, or on any other factors determining the type, class and amount of use or service of the sewerage system, or on any combination of any such factors, and may give weight to the characteristics of the sewage and other wastes and any other special matter affecting the cost of treatment and disposal thereof, including chlorine demand, biochemical oxygen demand, concentration of solids and chemical compositions. *In addition to any such periodic service charges, a separate charge in the nature of a connection fee or tapping fee, in respect of each connection of any property with the sewerage system may be imposed upon the person making such connection or upon the owner or occupant of the property so connected. Such connection charges shall be uniform within each class of users but the amount thereof shall otherwise be entirely within the discretion of the authority in order that*

*the combination of such connection fee or tapping fee and the afore-said periodic service charges shall meet the requirements of subsection (c) hereof.*[1]

Subsections (a) and (c) of *N. J. S. A.* 40:14A–8 were not changed. Subsection (a) authorizes every sewer authority to charge and collect rents, rates, fees or other charges (sometimes referred to as "sewer charges") for direct or indirect connections with, or the use or services of, the sewerage system, and subsection (c) directs the sewer authority to precribe and revise a schedule of service charges which "in any event shall be such that the revenues of the sewer authority will at all times be adequate to pay all expenses of operation and maintenance of the sewerage system * * *." As stated by the Chancery Division in *Kline v. Bellmawr Sewerage Authority,* 55 *N. J. Super.* 153, 161 (Ch. Div. 1959), aff'd *sub nom. Landy v. Bellmawr Sewerage Auth.,* 61 *N. J. Super.* 396 (App. Div. 1960), which dealt with the language of subsection (b) unchanged by the 1968 amendment and with subsection (c), "[t]he keystone is that such rents, rates, fees and charges 'shall * * * be uniform throughout the district *for the same type, class and amount of use or service of the sewerage system.*'"

■ The present controversy centers on what the Authority described in its rate schedule as "initial charge" which is referred to in the agreement between the parties as "a connecting charge." In essence the Authority maintains that this charge may be imposed at a higher rate on

---

[1]Changes or additions in text are indicated by italics, deletions by ~~strikeouts~~.

The 1968 supplement also added to section 8 subsection (d) which provides:

*Any county sewerage authority* may establish sewerage regions in portions of the district. Rents, rates, fees and charges which may be payable periodically, being in the nature of use or service charges, shall as nearly as the *sewerage authority shall deem practical and equitable, be uniform throughout the district for the same type, class and amount of use or service of the sewage systems* and shall meet all other requirements of subsection (b) hereof. [Emphasis added]

houses in a development than on other comparable dwellings in the community and this notwithstanding the Authority's requirement that a developer install, at its expense, the sewer facilities within its development. The uniform "annual charge" of $65 is not in dispute. A brief review of the March 1971 trial evidence will focalize the factual and legal contentions of the respective parties.

Frank Spatuzzi, president of S. S. & O. Corporation, was Developer's sole witness. He testified that there were no commercial uses in the development, the project was located three blocks from one of the commercial centers of the town and was within 150 to 200 feet of the interceptor or main sewer line of the Authority. In his opinion there was no substantial difference between the houses built in the development and other residential dwellings in the township, particularly with reference to use and consumption of water.

This witness stated that in 1967 his company purchased a lot outside the boundaries of the development and because a developer constructed a house thereon, a $900 connection fee was charged rather than a $700 fee which would have been the charge had the same house been constructed by an individual lot owner. He also testified that the total cost of the sewerage system installation within the development was $88,000, representing approximately $1,200 for each of the houses then built and to be constructed in the completed enterprise. When asked under cross-examination if this cost would be passed "along to the purchaser of homes," he replied "[t]o a certain extent we do." As to the additional $900 house-connection fee, Spatuzzi stated that it was not passed on to the buyer — "[t]hat was to the detriment of the corporation and we sold these houses for that much less * * * I have lost that much money."

The first witness for the authority was its attorney who explained that the agency had no power to assess or levy taxes and that its funds were derived solely from customer payments and annual municipal contributions pursuant to a bonding resolution and the service contract between the

Authority and the township. Although not personally involved in the rate-fixing process, he ventured the statement, in response to an inquiry concerning the $200 differential in connection fees, that "* * * under the *Airwick* case [*Airwick Industries, Inc. v. Carlstadt Sewerage Auth., infra*] we put up the nine hundred dollars in order to take care of the present overbuilding in order to accommodate future vacant land."[2] The attorney made it clear, however, that the Developer's sewer laterals were connected with the Authority's existing interceptor lines by the construction of an off-site branch main built by the Developer for which item of expense the Authority was obliged to reimburse the Developer.

The incumbent chairman of the Authority, Lucien Mackey, who had been one of its members since 1959, gave testimony to the effect that the Authority had never to his knowledge returned a profit. He testified as to the annual donations by the township from 1966 to date in order to balance the Authority's budget. According to his version the first treatment plant was built to service a small development and a limited area in the township, and in 1964, when the user demand was estimated at 300 to 500, the plant was reconstructed and enlarged to accommodate an anticipated capacity of 1500 sewer connections; the financing of the enlarged sewerage system was accomplished by means of a 1962 bond issue of $2,550,000.

When Mackey was interrogated concerning the rate revision schedule in 1965 and the basis for establishing an "initial charge" of $700 for single-family dwellings in class one, as opposed to a $900 charge applicable to development houses in class six, he stated it was "a carry-over from previ-

_____

[2]The *Airwick* case was not decided until October 26, 1970. Moreover, the Authority's answer, to Developer's complaint, which was filed before that decision avers in substance that the $900 charge per house connection represented the expense of extending the Authority's branch sewer line to Developer's property.

ous years" and conceded that he was unaware of any discussion as to the existing differences, stating "there might have been computations by the various members privately by themselves, but collectively, as a set of computations supporting this, I don't think they exist."

The Authority's consulting engineer since its creation, Peter Homak, a specialist in hydraulic and sanitary engineering, testified in substance that the first treatment plant was a temporary facility sufficient in size to serve the immediate needs of 200 homes, including an 80-house development known as the Harrison Brook Estates. The lowest bid for the construction of this plant was $140,000 and the Authority, considering the cost and the fact that a 200-unit facility was involved, determined that $700 should represent the "initial charge" for each sewered home. When the more comprehensive sewerage system was constructed following the 1962 bond issue, and in order to generate revenue for the retirement of bonds, the Authority decided to distinguish between existing homes and "undeveloped areas" by increasing the "initial charge" to $900 as to all homes in a development. He further attempted to explain this $200 differential as an equitable adjustment in favor of existing homeowners who had installed septic tanks and were required to make necessary changes in house plumbing, which had to be reversed to effectuate a connection with the sewer line in front of their respective homes. By way of further explication, the engineer referred to the fact that the reconstruction of the temporary treatment plant cost approximately $315,000, which when divided by his estimation of a 1,550 capacity connection system, represented approximately $200 per house and that development houses should to this increased extent share "their equitable costs of at least the treatment facilities." He further declared it was his understanding that every developer, including the first one — the Harrison Brook Estates — paid a $900 initial connection charge. Homak also observed that the current expansion plans of the Authority, to meet the projected needs of

the township, contemplate a further enlargement of the treatment plant and an extension of the sewerage system to unsewered areas of the municipality, to accommodate 5,000 to 6,000 connections over a ten-year design period at a total cost of approximately five to six million dollars.

We need mention only one more witness, Harold Heimbach, the municipal tax assessor. From his testimony it was disclosed that there are presently 3,044 houses in the township of which 1,823 are connected to the sewerage system. Other types of properties in the municipality include 81 commercials, 6 industrials, 46 exempt buildings, 88 farms and 545 vacant parcels of land.

The decision of the trial judge is barren as to essential fact findings. In a conclusory fashion his opinion states that plaintiff's contention "has been considered in a suit involving the installation of water mains," and referred to *Woodside Homes, Inc. v. Morristown,* 26 *N. J.* 529 (1958), for the propositions that inequality is not "demonstrated by the differentiation of treatment between individuals and developers" and that developers "may and have been treated as a separate class." *Id.* at 544. *Airwick Industries, Inc. v. Carlstadt Sewerage Auth.,* 57 *N. J.* 107 (1970), app. dism. and *cert.* den. 402 *U. S.* 967, 91 *S. Ct.* 1666, 29 *L. Ed.* 2d 132 (1971), was also cited.

In the *Woodside Homes* case it was held that a prior written agreement estopped a developer from attacking the imposition of water main extension costs and this Court noted that developers may under certain circumstances be required to assume costs attributable to their development. The logical basis and justification for a different classification or category with respect to developers, as therein recognized, does not negate the underlying statutory mandate for equality and uniformity of treatment of homeowners. It was proclaimed in the later case of *Longridge Builders, Inc. v. Planning Bd. of Princeton Tp.,* 52 *N. J.* 348, 350 (1968), that a developer can be compelled "only to bear that portion of the cost which bears a rational nexus to the needs created

by, and benefits conferred upon, the subdivision." See also Johnston, "Constitutionality of Subdivision Control Exactions: The Quest for a Rationale," 52 *Cornell L. Q.* 871 (1967).

*Airwick, supra,* is not to the contrary. There a "capacity charge," based on building area alone, when employed as the sole basis of a sewerage charge, was held invalid because it did not bear the proper relationship to "type, class and amount of use and service" as prescribed by the statute. The Court, however, upheld the Authority's schedule of connection fees that escalated with the passage of time requiring a potential owner "to absorb a fair proportion of the sum theretofore paid by the actual users for principal and interest on the bonds." In discussing *N. J. S. A.* 40:14A–8 and the subsections thereof as amended, it was declared:

> The logical construction of the foregoing subsections is that the legislature intended that the installation and construction costs, *i. e.,* debt service charges, should in the first instance be financed by the actual users but should ultimately be borne by all the properties benefited, including the unimproved lands. For that reason there was provided a charge in the nature of a connection charge to be imposed upon unimproved properties in order that they assume a fair share of the original construction costs when they become improved properties.
>
> The Authority may, therefore, include as part of the connection fee a sum of money which will represent a fair contribution by the connecting party toward the debt service charges theretofore met by others. The statute need not be read to require precise mathematical equality, but rather to contemplate rough equality, keeping in mind that we are in an area in which, as with respect to other tax impositions, absolute equality is neither feasible nor constitutionally vital. * * * [57 *N. J.* at 122]

A similar result has been reached in other jurisdictions.[3]

---

[3] In *Western Heights Land Corp. v. City of Fort Collins,* 146 *Colo.* 464, 362 *P.* 2d 155, 157 (Sup. Ct. 1961), the Colorado Supreme Court stated broadly in the course of rejecting a developer's challenge to higher connection charges for new users, that such charges are not discriminatory when rates are "determined upon the same basis for all new users of the city's facilities." See also *State ex rel.*

In a subsequent analogous case, *Deerfield Estates, Inc. v. Tp. of East Brunswick,* 60 *N. J.* 115 (1972), initiated by a proceeding in lieu of prerogative writ, there was a controversy over a condition of approval, imposed by the planning board of a municipality that owned and operated its own water system, that the developer install the water mains throughout its proposed subdivision or that installation thereof be effectively guaranteed. In this Court's decision the relevant authorities were analyzed and synthesized with a recognition of the generally accepted rule "that a municipality, engaged in furnishing water to its inhabitants, has a large measure of discretion as to the limits to which it should extend its mains," and a declaration that, "[a]t the same time there is an obligation to supply impartially all applicants in substantially like position," citing Annotations, "Right to Compel Municipality to Extend its Water System," 45 *A. L. R.* 829 (1926), 48 *A. L. R.* 2d 1922 (1956), and 56 *Am. Jur., Waterworks,* § 61 at 966. 60 *N. J.* at 130. It was then pointed out that there are three principal ways by which the costs and revenues of a water main extension project may be financed: (1) it "may be undertaken entirely at municipal cost and expense," or (2) the municipality "may undertake the project as a local improvement and assess the cost against the owners of the properties benefited pursuant to the procedure outlined in *N J. S. A.* 40:56–1 *et seq.*," or (3) the municipality may "require that the work be done at

*Stoeckle v. Jones,* 161 *Ohio St.* 391, 119 *N. E.* 2d 834, 836 (Sup. Ct. 1954) ; *Hartman v. Aurora Sanitary Dist.,* 23 *Ill.* 2d 109, 177 *N. E.* 2d 214, 218–220 (Sup. Ct. 1961) ; *Seltzer v. Sterling Tp.,* 371 *Mich.* 214, 123 *N. W.* 2d 722, 726 (Sup. Ct. 1963) ; *Beauty Built Construction Corp. v. City of Warren,* 375 *Mich.* 229, 134 *N. W.* 2d 214, 219 (Sup. Ct. 1965) ; *Rutherford v. City of Omaha,* 183 *Neb.* 398, 160 *N. W.* 2d 223, 228 (Sup. Ct. 1968) ; *Metro Homes, Inc. v. City of Warren,* 19 *Mich. App.* 664, 173 *N. W.* 2d 230 (Ct. App. 1970), *cert.* den. 398 *U. S.* 959, 90 *S. Ct.* 2175, 26 *L. Ed.* 2d 544 (1970). The charges must be fair and reasonable and not discriminatory. See generally 64 *C. J. S. Municipal Corporations* § 1805d at 271 (1950).

the expense of the developer either with or without a formula providing for partial or total reimbursement," in situations where appropriate local legislation permits and "when it is fair and equitable that this be done."[4] 60 *N. J.* at 131. Any one of these alternatives may be employed "as long as the result, as among its consumers, is equitable." *Id.* at 132. The case was remanded for more extensive proof because the record was inadequate to permit a determination as to whether the trial court was correct in granting the motion of the municipality for summary judgment.

On the day the instant appeal was argued, this Court released its opinion in *Colonial Oaks West, Inc. v. Tp. of East Brunswick,* 61 *N. J.* 560 (1972), and counsel were requested to submit memoranda expressing their respective views as to its application. This has been done with each party urging an interpretation supportive of its arguments on appeal. We disagree, however, with the contention in the memorandum of the Authority that "the logic of the opinion in the Colonial Oaks West Inc. case confirms the finding of the Courts below in favor of the defendant Authority."

In a multiple complaint plaintiffs in the *Colonial Oaks* litigation sought relief *inter alia* for reimbursement of the developer's costs incident to the installation of on-site water mains and a determination that certain fee requirements were unreasonably high and should be set aside and declared invalid. The evidence was so deficient it was found necessary to remand the matter to the Law Division for additional testimony and the due application of the principles set forth in the Court's opinion. The rationale advanced in *Deerfield,*

---

[4]See n. 3, *Deerfield, supra,* 60 *N. J.* at 131: "While the ability of a municipality under appropriate circumstances to impose extension costs upon a developer has been encouraged for some time * * * to date this court has not been required to so hold," citing Cunningham, "Control of Land Use in New Jersey Under the 1953 Planning Statutes," 15 *Rutgers L. Rev.* 1 at 42–45 (1960) ; *Levin v. Livingston Tp.,* 35 *N. J.* 500 at 515 (1961) ; and *Lake Intervale Homes v. Parsippany-Troy Hills Tp.,* 28 *N. J.* 423 (1958).

*supra,* however, was approvingly adopted with particular concern as to whether any of the costs recoverable by the developer were passed on by it to the purchasers, in which event any such recoveries were to be placed in trust under suitable court directions awaiting formal claims by the purchasers or escheat if they failed to assert their claims. The polestar of these decisions was the equality and uniformity of treatment and the avoidance of any arbitrary or discriminatory actions between persons similarly circumstanced within the community served by the utility. We return now to the record under review.

The first treatment plant constructed by the Authority in 1959 has been enlarged and the sewerage system has been expanded until now 1823 homes have been connected with it. The evidence is unclear as to how many of these units have been charged an "initial fee" of $700 or $900 or how many have been categorized as class one or class six respectively. Nor do the proofs disclose how many dwellings in class one were converted from septic systems as compared with new homes where a direct sewer connection has been made. The record is also silent as to the quantum of unimproved lands benefited by the existing utility installation. If it be true that development houses have always been charged the $900 fee, then it would appear that no distinction has been made between such homes built prior to, and those built subsequent to, the bond issue.

The evidence indicates that historically the $200 differential in "initial fees" was established as a means to recoup the original treatment plant cost and that the practice was continued for a similar purpose when the plant was subsequently enlarged; the current rate structure of the Authority was adopted prior to the 1968 amendment to the Sewerage Authorities Law and antedates by over four years *Airwick, supra.*

While the decisions to which we have adverted support a higher connection charge assessable to new users of a sewerage system in order to reflect a fair proportion of the sum

previously paid by others toward its actual costs, including financing, the Authority's separate classification of development houses assumes that these homes receive greater benefit from such previous payments than do other newly-improved properties. If a new homeowner of nondevelopment property can tie into an existing publicly financed system for a connection fee of $700, but a purchaser of a comparable house in a development is charged a connection fee of $900, there is an obvious, unsatisfactorily explained disparity that does violence to the basic concept of uniformity and equality intended by the applicable legislation. *N. J. S. A.* 40:14A–8 (b) mandates that connection charges be "uniform within each class of users." As the record now stands no rational basis appears to support the Authority's treatment of "development" homes, with respect to connection charges, as a class separate from other similar dwellings in the community receiving the same degree of benefits.

Here the developer protested the joint imposition of a connection fee and of the cost of installing the laterals. In the complaint, the developer sought to recover the connection fee, apparently conceiving that the connection fee represented a contribution to the capital cost which duplicated the contribution made by the installation of the laterals. We see no point in separating the two charges. The final question is whether the total contribution required of the developer constituted a discriminatory, inequitable treatment when measured against the charges made against the other users of the utility.

■■ In this regard, it is of no moment that the planning board may require that laterals be installed as a prerequisite for approval or development. The planning board is not concerned with the ultimate situs of the dollar burden. Whether that burden should be the burden of developers or of a utility, private or public, is determined, not by the planning act, but by legal principles applicable to the obligation of the utility to render service. As between the utility and the developer, the developer may be required to provide initial

financing for the laterals to cover the risk that the development will fail or not bear its proper share of the costs. Ultimately, however, if the yield is fairly adequate to that end, there must be a rebate, to the end that the service will be provided to all on a basis of substantial equality.

If the cost of installing laterals was in fact borne by other consumers of the utility's service, there would be a parity of treatment in that regard and the inquiry would then turn to the connection fee. As to the connection fee, we repeat that on the face of things there seems to be no justification for charging $700 or $900 depending upon whether the house is built by a developer or by an individual for his own use.

■■ The statutory scheme of equality and uniformity contemplates not only that developers be treated alike but that all homes connected with the sewerage system, whether or not they are part of a development project, should be dealt with in a nondiscriminatory manner. In the present case the Authority is accountable with respect to the cost of the laterals and the connection fees collected from the developer to the extent that such costs and fees may exceed a reasonably proportionate, equitable and uniform share to be borne by the respective houses in its subdivision.

It is plain from what is presently before us that the Authority's rate structure of 1965–1966 should be promptly revised to reflect practical, uniform and equitable treatment of dwelling properties similarly situated so as to conform with *N. J. S. A.* 40:14A–8 as amended to date and to mirror adherence to our current interpretative decisional law. It is equally plain that the inadequacy of the existing record requires a remand to the trial court for the taking of additional evidence, the giving of due consideration to the legal principles herein set forth and the making of specific findings of fact and conclusions of law.

If it should be concluded that the developer is entitled to any recovery, either with respect to reimbursement for its costs for installation of the laterals or in connection with any overcharges for connection fees, there should also be a de-

termination as to whether any portion thereof was passed on to the purchasers in the development, and if so, as emphasized in the *Deerfield* and *Colonial Oaks* cases, *supra,* then the moneys for which the purchasers should be reimbursed shall be placed in trust under suitable court directions awaiting formal claims by the respective purchasers or escheat in the event of abandonment.

■ The remaining question is whether the action is barred because the developer acceded to the defendant's insistence upon the contract as the defendant prepared it.

In reaction to the communication from the developer protesting the demanded payments, the Authority immediately cancelled three permits previously issued for sewer connections, insisted that the proposed agreement be executed without any reservations and required the developer to adopt a corporate resolution to the effect that it acted voluntarily and without compulsion or coercion on the part of the Authority. Such an ultimatum precluded the possibility of negotiations and, indeed, suggests a conscious maneuver by the Authority to seize upon an advantage and a deliberate effort to insulate its position against a possible challenge no matter how valid the developer's claim might be. The inescapable conclusion is that the Authority exercised a species of duress sometimes known as "business compulsion."[5]

The Appellate Division, in *S. P. Dunham & Co. v. Kudra,* 44 *N. J. Super.* 565 (App. Div. 1957), reviewed the process of change in the law of duress and concluded that "the test now is simply this — has the person complaining been constrained to do what he otherwise would not have done?"

---

[5] See 13 *Williston, Contracts* (3d ed. 1970), § 1617; Dalzell, "Duress by Economic Pressure," 20 *No. Car. L. Rev.* 237, 341 (1942) (pts. 1 and 2) ; Dawson, "Economic Duress — An Essay in Perspective," 45 *Mich. L. Rev.* 253 (1947) ; Annotation, "Doctrine of 'Business Compulsion,'" 79 *A. L. R.* 655 (1932) ; *Ross Systems v. Linden Dari-Delite, Inc.,* 35 *N. J.* 329, 335 (1961) ; *Woodside Homes, Inc. v. Morristown, supra,* 26 *N. J.* at 544; *Ewert v. Lichtman,* 141 *N. J. Eq.* 34, 35–36 (Ch. 1947).

*Id.* at 570. *West Park Ave., Inc. v. Ocean Tp.,* 48 *N. J.* 122 (1966), involved a home builder's suit against a municipality and a board of education to recover moneys allegedly paid under duress. Our opinion cited *Dunham* with the observation that "[t]he situations are so varied that one cannot be sure of a simple formula. But it does seem safe to say that in evaluating the behavior of the parties, the nature and degree of wrongfulness of the payee may be the decisive factor." 48 *N. J.* at 129. The Court emphasized that a wrong may be all the more grievous because the power of public office was put behind it, quoting from *Robertson v. Frank Brothers Company,* 132 *U. S.* 17, 23, 10 *S. Ct.* 5, 6, 33 *L. Ed.* 236, 238 (1889): "When the duress has been exerted by one clothed with official authority, or exercising a public employment, less evidence of compulsion or pressure is required * * *." It then added: "There should be every inducement to local government to stay within the law. Accountability for moneys so flagrantly obtained serves that end." 48 *N. J.* at 131.

Here the developer's suit was timely instituted and we find no merit to the defenses of laches and estoppel raised by the Authority.

Reversed and remanded for further proceedings consonant. with this opinion.

*For reversal and remandment*—Chief Justice WEINTRAUB,. Justices JACOBS, HALL and MOUNTAIN, and Judges CONFORD, SULLIVAN and LEWIS—7.

*For affirmance*—None.