192 N.J. Super. 159 (1983)
469 A.2d 502
LUV CONDOMINIUM ASSOCIATION AND STONEGATE VILLAGE CONDOMINIUM ASSOCIATION, PLAINTIFFS-APPELLANTS,
v.
BOROUGH OF STANHOPE, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Submitted September 27, 1983.
Decided November 7, 1983.
*162 Before Judges MICHELS, KING and EDWARD GAULKIN.
Purzycki & Gorney, attorneys for appellants (Edward W. Gorney, of counsel and on the brief).
Valentino, Dunne & Stein, attorneys for respondent (Richard A. Stein, of counsel and on the brief).
The opinion of the court was delivered by MICHELS, P.J.A.D.
Plaintiffs Luv Condominium Association (Luv) and Stonegate Village Condominium Association (Stonegate) appeal from a judgment of the Law Division that dismissed their challenge to an ordinance of defendant Borough of Stanhope (Stanhope) that revised the sewer user charges for the municipal sewer system.
The facts giving rise to this appeal are as follows: In the early 1960's, a plan was developed for the construction of a public sewer system for the Lake Musconetcong basin. This sewer system, now completed, encompasses Stanhope, which is located in Sussex County, and the Borough of Netcong and parts of Roxbury Township and Mount Olive Township, all of which are located in Morris County. In 1965, Stanhope and Netcong created the Musconetcong Sewerage Authority (authority) pursuant to the Sewerage Authorities Law (N.J.S.A. 40:14A-1, et seq.) to treat the effluent collected by the sewer systems of the four municipalities. The authority constructed the sewer plant and the interceptor lines. Each municipality remained responsible for construction and maintenance of trunk lines and collector lines. The authority bills each municipality quarterly based upon the number of gallons of effluent from the municipality that it treats. The municipal sewer system of Stanhope was constructed between 1967 and 1979. Phase I, consisting of 680 sewer connections, was completed in 1969. Phase II, consisting of 220 sewer connections, was completed in 1979. As the phases of the sewer system became operative, Stanhope enacted and subsequently revised an ordinance establishing the rates for use *163 of the system. Charges for items such as inoperable meters, connection permit fees, connection fees and inspection fees were also set by ordinance.
The Luv complex is located on a 30 acre tract of land in the western section of Stanhope. Construction on the development began in 1973 and was completed in 1981. The complex contains 340 housing units which are grouped in 19 buildings. Luv's developer constructed 168 linear feet of pipe off the condominium site to connect with the existing municipal sewer system. It also constructed 10,872 linear feet of sewer line and 77 manholes on the site. These sewer lines were tied to the municipal sewer system in March 1972. None of the on-site improvements, including the sewer lines, have ever been dedicated to or accepted by Stanhope. Luv is required to maintain and repair the sewer lines within the complex. Pursuant to an agreement with the developer, Lenape Valley Regional High School also uses the sewer lines constructed by Luv in order to connect with the municipal sewer system.
The Stonegate complex is located in the northwestern section of Stanhope. Construction on this complex proceeded between 1973 and 1975. It consists of 103 units located within 11 buildings on a 21 acre site. As with the Luv complex, the Stonegate developer constructed 1420 linear feet of pipe off the condominium site to connect with the municipal sewer system. It also placed 5693 linear feet of sewer pipe and 29 manholes on the site. Three private residences located within the complex use the Stonegate sewer lines under an agreement with the developer to connect with the municipal sewer system. None of the on-site improvements, including the sewer lines, have ever been dedicated to or accepted by defendant, and Stonegate is required to repair and maintain the on-site sewer lines.
Since its creation, the Luv complex has been serviced by a single water meter and, prior to March 10, 1981, was treated as a single customer of the municipal sewer system. The same is true of the Stonegate complex.
*164 On March 10, 1981 Stanhope adopted an ordinance establishing the following sewerage user charges:

 Single-family and multifamily residences and all other [Fee]
 buildings, unless otherwise exempt:
 For each single-family residence and each unit of a [$] 150.00
 multifamily residence in which the sewer use is
 measured by a water meter, annually.
 In addition thereto, for actual use, as measured by .88
 the water meter, per thousand gallons.
 Nonfunctioning and unreadable meters, per day, .65
 per unit, from the date of the last reading.
 For all unmetered single-family residences, unmetered 216.00
 multifamily and all other unmetered buildings,
 per unit, annually.
 Service to unimproved lot, annually. 102.00
 For all other buildings, actual usage as measured by
 the water meter, per thousand gallons. $ 3.15

For the purposes of this section, all individual multifamily units serviced only by a water meter for the building or group of buildings in which the unit is located shall each be considered a metered unit.
All of the above sewer charges for single-family residences, multifamily residences and all other buildings may be billed on an annual, semiannual or quarterly billing; the flat rate charge and the corresponding gallonages shall be prorated accordingly.
Under this ordinance the single-family residence fee of $150 per year plus usage charge is applicable to condominium units. Thus, although the Luv complex is still serviced by a single water meter, each unit owner is now billed as if his condominium has a separate water meter. The same is true of Stonegate unit owners. There are approximately 150 other multi-family units in Stanhope also being charged the $150 rate plus usage charges under this ordinance.

I
Luv and Stonegate challenge the 1981 amendatory ordinance on the grounds that it is arbitrary, unreasonable and *165 discriminatory. They claim it requires condominium unit owners to bear more than their fair share of the original costs of the municipal water system and that the sewerage charges established therein fail to meet the standards set forth in N.J.S.A. 40:14A-8 that such "[r]ents, rates, fees and charges ... shall as nearly as ... practicable and equitable be uniform throughout the district for the same type, class and amount of use or service of the sewerage system."[1]See also N.J.S.A. 40:14B-22. Specifically, they claim that a lack of uniformity exists since each condominium association was previously billed as a single customer and now under the 1981 ordinance each condominium unit is billed as a separate customer.
N.J.S.A. 40:14A-8(b), in part, provides:
(b) Rents, rates, fees and charges, which may be payable periodically, being in the nature of use or service charges, shall as nearly as the sewerage authority shall deem practicable and equitable be uniform throughout the district for the same type, class and amount of use or service of the sewerage system, and may be based or computed either on the consumption of water on or in connection with the real property, making due allowance for commercial use of water, or on the number and kind of water outlets on or in connection with the real property, or on the number and kind of plumbing or sewerage fixtures or facilities on or in connection with the real property, or on the number of persons residing or working on or otherwise connected or identified with the real property, or on the capacity of the improvements on or connected with the real property, or on any other factors determining the type, class and amount of use or service of the sewerage system, or on any combination of any such factors, and may give weight to the characteristics of the sewerage and other wastes and any other special matter affecting the cost of treatment and disposal thereof, including chlorine demand, biochemical oxygen demand, concentration of solids and chemical composition.
This provision of the Sewerage Authorities Law mandates that sewer rates, "being in the nature of use or service charges, ... shall as nearly as the sewerage authority shall deem practical *166 and equitable be uniform throughout the district for the same type, class and amount of use or service of the sewerage system." The 1981 amendment to Stanhope's sewerage ordinance corrected an inequity. Before the enactment of the ordinance, residential dwelling units were not treated uniformly. Owners of condominium units in the Luv and Stonegate complexes were not paying their fair share of the installation, construction, maintenance and operating costs of the sewer system. To the contrary, they were receiving a preferred rate prohibited by the letter and spirit of the Sewerage Authority Law. Neither the fact that condominiums represent a different type of land ownership than single family homes or apartments nor the fact that they are part of a development rationally supports a difference in treatment. Cf. S.S. & O. Corp. v. Bernards Tp. Sewerage Auth., 62 N.J. 369, 383-385 (1973).
In Piscataway Apt. Assoc. v. Piscataway Tp., 66 N.J. 106 (1974), the Supreme Court considered and rejected a similar charge of discrimination where apartment houses were being charged the same sewer rate per dwelling unit as smaller multiple-family dwellings and single-family dwellings, stating:
Preliminarily, it is our view that a municipally owned sewer utility may reasonably fix the same dwelling unit sewerage use charge for all single-family occupancy units, whether in large apartment houses, smaller multiple rental buildings or single-family residences. We see no compulsion for making rates dependent on specific or average sewerage flows in different categories of housing, particularly when, as here, the municipality is not operating through a sewerage authority pursuant to the particularized regulations of N.J.S.A. 40:14A-1 et seq. All that is required is classification of rates on a basis free from patent unreasonableness. See N.J.S.A. 40:63-7, Crowe et al. v. Mayor and Coun. of the Tp. of Sparta, 106 N.J. Super. 204, 206 (App.Div.), certif. den. 55 N.J. 79 (1969). This feature of the instant ordinance is not unreasonable. See Oradell Village et als. v. Tp. of Wayne, 98 N.J. Super. 8, 13 (Ch.Div. 1967), aff'd o.b. 101 N.J. Super. 403 (App.Div. 1968), aff'd o.b. 53 N.J. 496 (1969). [at 109]
Similarly, in Phoenix Associates v. Edgewater Pk. Sewer. Auth., 178 N.J. Super. 109 (App.Div. 1981), aff'd o.b. 89 N.J. 2 (1982), we rejected a charge that a sewerage authority acted arbitrarily and discriminatorily "in charging one- and two-bedroom apartment units the same annual fee for sewer service as it charge[d] single family residences and condominium units." *167 In rejecting plaintiffs' contention that classification of residences should be based upon the number of bedrooms, we noted:
Plaintiffs failed to show that defendant's rate schedule, which includes single-family dwellings and one- and two-bedroom apartments, as well as all multi-family dwellings, in one classification is without a rational basis. The Legislature gave a sewerage authority wide discretion in establishing sewer rates and mandated that the rates, as nearly as the authority deems practicable and equitable, be uniform throughout the district for the same type, class and amount of use or service of the system. N.J.S.A. 40:14A-8(b). While an authority may consider the apparent differences between apartments and single-family dwellings and provide a different rate for them, the authority is not mandated to do this. [at 121]
Accordingly, we hold that Stanhope established a uniform sewer rate for all residential dwelling units whether single-family residences, apartments or condominiums and therefore the 1981 ordinance as applied to condominium unit owners in the Luv and Stonegate complexes was not arbitrary, capricious or discriminatory.

II
We are also satisfied that Luv and Stonegate were properly required to share in the costs of the construction of phase II of the sewer system. A municipality may finance a sewer system project in several different ways. First, the municipality can bear the entire cost and expense. Second, it may undertake the project as a local improvement and assess the cost against the property owners benefitted thereby pursuant to the procedure outlined in N.J.S.A. 40:56-1 et seq. And, third, it may require the work to be done at the expense of the developer either with or without a formula providing for partial or total reimbursement. See Deerfield Estates, Inc. v. East Brunswick Tp., 60 N.J. 115, 131 (1972). See also S.S. & O. Corp. v. Bernards Tp. Sewerage Auth., supra, 62 N.J. at 381-382.
Here the sewer system was constructed in two phases. Stanhope initially financed the system by federal and state grants and loans and by general obligation bonds. Over the 12 year period of the first phase, Luv and Stonegate were tied into the system. Thereafter, the second phase was completed and Stanhope *168 adopted the ordinance under review to pay the costs of the entire system by way of assessment.
Luv's and Stonegate's claim that under N.J.S.A. 40:56-1 et seq. the construction costs of phase II of the system should have been assessed only against property owners benefitted by this phase lacks merit. In Rutan Estates, Inc. v. Belleville, 56 N.J. Super. 330, 336 (App.Div. 1959), certif. den. 30 N.J. 601 (1959), the appellate court determined that it would be arbitrary and capricious for a financially sound municipality to bear the costs of constructing water mains throughout the bulk of the municipality and later require the owner of the one remaining unserved parcel to himself bear the cost of such improvement under N.J.S.A. 40:56-1. To adopt the position put forward by Luv and Stonegate, and assess the entire cost of construction against only those property owners benefitted by the second phase, while not requiring previous users to contribute to these later costs of the system, would likewise be arbitrary and capricious.[2]
A municipality may construct a public sewer system as a local improvement and assess the costs against the property owners benefitted, provided the result, as among its users, is equitable. Deerfield Estates, Inc. v. East Brunswick Tp., supra, 60 N.J. at 132. While the record is not entirely clear, it appears that not only the costs of phase II, but rather the costs of the entire municipal sewer system were to be assessed against all users. In our view this assessment plan is equitable and there is no *169 legal justification to interfere with the method chosen by Stanhope to recover the costs of its system.

III
Luv and Stonegate contend that Stanhope is required to bill its customers by usage because the authority bills Stanhope in that manner. We disagree. Under N.J.S.A. 40:14A-23, a sewerage authority can contract with a governmental unit for collection, treatment and disposal of sewerage. The governmental unit is thereby authorized to do what is "necessary, convenient or desirable" to carry out the terms of the contract and to provide payment thereunder. While payment to the sewerage authority may be computed "by a formula based on any factors or other matters described in [N.J.S.A. 40:14A-8(b)]," there is no expressed or implied requirement that the governmental unit bill its customers in the same way that the sewerage authority bills it. It is sufficient if the governmental unit bills its customers in conformance with N.J.S.A. 40:14A-8(b). Here, the method employed by Stanhope for billing its customers conformed with the statutory mandate.

IV
Luv and Stonegate further contend that Stanhope failed to charge new connectors their fair share of the original cost of the municipal sewer system because these new users were not charged a connection fee as prescribed by N.J.S.A. 40:14A-8(b).
This argument again focuses upon N.J.S.A. 40:14A-8(b) which, in addition to setting standards for periodic sewer charges, provides for imposition of sewer connection fees. The statute provides:
In addition to any such periodic service charges, a separate charge in the nature of a connection fee or tapping fee, in respect of each connection of any property with the sewerage system may be imposed upon the person making such connection or upon the owner or occupant of the property so connected. Such connection charges shall be uniform within each class of users but the amount thereof shall otherwise be entirely within the discretion of the authority in order that the combination of such connection fee or tapping fee and the *170 aforesaid periodic service charges shall meet the requirements of subsection (c) hereof; provided, however, that in assessing any such connection charges, the sewerage authority shall give credit in every instance to the owner or occupant of any property wherein or whereon any action or improvement has been taken or effectuated, in accordance with such reasonable specifications as may be prescribed by the sewerage authority, which results in a reduction of the costs actually incurred by the sewerage authority in making such connection below such costs actually incurred in making such connections to property wherein or whereon no such action or improvement has been taken or effectuated. The amount of any such credit shall be equal to the percentage difference between the costs actually incurred by the sewerage authority in making such connection to a property wherein or whereon such an action or improvement has been taken or effectuated, and the average during the immediately preceding year of such costs actually incurred by the sewerage authority in making such connections to property wherein or whereon no such action or improvement has been taken or effectuated.
In Airwick Industries, Inc. v. Carlstadt Sewerage Auth., 57 N.J. 107 (1970), app. dism. and cert. den. 402 U.S. 967, 91 S.Ct. 1666, 29 L.Ed.2d 132 (1971), the Supreme Court, in construing N.J.S.A. 40:14A-8, stated:
It is therefore seen that the purpose of the annual charge is to raise a sum sufficient to pay (1) all expenses of operation and maintenance and (2) the principal and interest on any bonds and to maintain reserves or sinking funds for the funding of the Authority debt. The former of these items has its genesis in the actual use of the system for waste disposal. The latter has its genesis in the original construction and installation costs, for which the bonds were issued and sold. The principal and interest on these obligations represent that cost.
It is apparent that there should be two sources from which to raise the funds required for said purposes in order that the charges remain "equitable" and "uniform." Those properties actually using the system should alone absorb the cost of "operating and maintenance," since the expenditures for such purposes arise solely from that use. On the other hand all properties, where service is available, whether actually using the system or not, should absorb the debt cost. The basis for this conclusion lies in the fact that the debt, as noted, represents the construction and installation expense, from which every property received some benefit and increase in value. [at 120]
Later, in concluding its analysis of the provision, the Court stated:
The logical construction of [N.J.S.A. 40:14A-8(b) and (c)] is that the legislature intended that the installation and construction costs, i.e., debt service charges, should in the first instance be financed by the actual users but should ultimately be borne by all the properties benefited, including the unimproved lands. For that reason there was provided a charge in the nature of a connection charge to be imposed upon unimproved properties in order that they *171 assume a fair share of the original construction costs when they become improved properties.
The Authority may, therefore, include as part of the connection fee a sum of money which will represent a fair contribution by the connecting party toward the debt service charges theretofore met by others. The statute need not be read to require precise mathematical equality, but rather to contemplate rough equality, keeping in mind that we are in an area in which, as with respect to other tax impositions, absolute equality is neither feasible nor constitutionally vital. The Authority may, therefore, in its discretion, prescribe a schedule of connection fees escalating with the passage of time, requiring a potential user to absorb a fair proportion of the sum theretofore paid by the actual users for principal and interest on the bonds. [at 122]
In White Birch Realty Corp. v. Gloucester Tp. Mun. Util., 80 N.J. 165 (1979), the Supreme Court reaffirmed the Airwick principal "that a connector [i]s obligated to pay his proportionate part of the cost of the system so that a new customer ... stand[s] on a footing comparable to existing customers." But the Court noted that:
We did not mean to imply in Airwick that the method of determining the fair contribution could be calculated only by ascertaining the debt service charges previously paid by the sewerage users. There may be any number of ways in which a computation of a fair share can be fixed, and a utilities authority is free to adopt any one which will accomplish the result of fairly apportioning system costs among the users. Factual circumstances may justify or necessitate different methodologies. In Airwick the factual pattern concerned a new system and costs to be attributed to customers who joined that system; whereas here the Authority had 2200 customers at the outset, substantial monies had been spent for improvements before the developers came on the line, and ten years after its initial bond issue in 1963 it raised another $1,825,000 to expand two treatment plants and install two pumping stations so that another 4000 customers could be added to the system.
As we have seen in this case, the experts have made several different proposals, the seeds of which embody plans which may be deemed reasonable. In the final analysis, this policy decision should be made by the Authority. Under these circumstances it is generally preferable, if upon judicial review a connection charge is found to be unreasonable due to the Authority's methodology, that the cause be returned to the Authority to correct the situation by adopting new or amended procedures. [at 176-177]
In every case, regardless of at what point in time or in the development of the sewer system a connection is made, the new connector should be treated in a manner consistent with the treatment of all other connectors. See Rutan Estates, Inc. v. Belleville, supra.
*172 Luv and Stonegate claim that Stanhope failed to charge connection fees to new customers hooking up to the municipal sewer system. Stanhope maintains that the actual connection fee was assessed in accordance with an ordinance separate from the sewer user rate ordinance. Unfortunately, the record before us is too inadequate to permit a determination of this issue. Although there was testimony at trial that a $500 connector fee was established by a 1969 ordinance;[3] that this ordinance remained in effect as of the time of the enactment of the 1981 sewer user rate ordinance; and that new users were still being charged in accordance therewith, this particular ordinance was not furnished to us on this appeal. In any event, the trial judge did not address or determine this factual dispute, necessitating a remand for the submission of more extensive proofs and determination of the issue in the first instance by the trial judge.
If, on remand, it is determined by the trial judge that no connection fees were charged to new connectors, the mandate of Airwick and White Birch that new connectors pay their fair share of system's cost and thereby be placed on an equal footing with existing customers would not have been met. In such event the matter would then have to be remanded to Stanhope to adopt new or amended procedures in accordance with the principles discussed above. It is irrelevant that all connectors were apparently treated the same. Stanhope's witness has testified that a percentage of all user fees collected since the inception of the system has been assessed for payment of debt service charges. Customers began hooking up to the municipal sewer system in 1969. From the time of their connection forward they have contributed to the cost of the system through their sewer service charge. Thus, a subsequent customer may *173 have received an unjustified windfall since he may not have been required to match the earlier customer's contribution to the cost of the system through payments of annual sewer service charges. See Airwick, supra, 57 N.J. at 122.
Furthermore, if the testimony from Stanhope's witness that connection fees were charged is accepted by the trial judge on remand another complication arises. The witness testified that the connection fees only covered installation costs and did not cover the entire system costs or, more specifically, the debt service costs. Again the mandate of Airwick and White Birch would not have been fulfilled.[4] Therefore, the matter would have to be remanded to Stanhope to adopt procedures prospectively allocating the entire system costs, including debt service costs, among its customers.

V
Luv and Stonegate also contend that they have been required to bear a disproportionate share of the prior system costs and are entitled to a credit for costs incurred by the developer in installing the on-site and off-site sewer lines necessary to connect to the system, which costs were passed onto condominium unit purchasers. The developers of the Luv and the Stonegate complexes were, apparently, required to construct these sewer pipes both on and off the development site in order to obtain subdivision approval. However, on-site improvements have not been dedicated to Stanhope, and the unit owners continue to own an undivided interest in them as common elements. The record is silent as to the off-site improvements. In S.S. & O. Corp. v. Bernards Tp. Sewerage Auth., supra, the developer was required to dedicate the sewer line improvements located within the development to the sewerage authority and sought therefore *174 to recover its connection fee, alleging that this fee represented a contribution to capital which duplicated the contribution made by the installation of the laterals. The Supreme Court, in discussing the developer's entitlement to a rebate, emphasized:
We see no point in separating the two charges [connection fee and the cost of installing the laterals]. The final question is whether the total contribution required of the developer constituted a discriminatory, inequitable treatment when measured against the charges made against the other users of the utility.
In this regard, it is of no moment that the planning board may require that laterals be installed as a prerequisite for approval or development. The planning board is not concerned with the ultimate situs of the dollar burden. Whether that burden should be the burden of developers or of a utility, private or public, is determined, not by the planning act, but by legal principles applicable to the obligation of the utility to render service. As between the utility and the developer, the developer may be required to provide initial financing for the laterals to cover the risk that the development will fail or not bear its proper share of the costs. Ultimately, however, if the yield is fairly adequate to that end, there must be a rebate, to the end that the service will be provided to all on a basis of substantial equality.
If the cost of installing laterals was in fact borne by other consumers of the utility's service, there would be a parity of treatment in that regard and the inquiry would then turn to the connection fee....
The statutory scheme of equality and uniformity contemplates not only that developers be treated alike but that all homes connected with the sewerage system, whether or not they are part of a development project, should be dealt with in a nondiscriminatory manner. In the present case the Authority is accountable with respect to the cost of the laterals and the connection fees collected from the developer to the extent that such costs and fees may exceed a reasonably proportionate, equitable and uniform share to be borne by the respective houses in its subdivision. [62 N.J. at 384-385]
See also Piscataway Apt. Assoc. v. Piscataway Tp., supra, 66 N.J. at 110; Colonial Oaks West, Inc. v. East Brunswick Tp., 61 N.J. 560 (1972).
There appears to be no justification in the record for any inference that the developers of the Luv and Stonegate complexes were treated any differently than other property owners with respect to the on-site sewer line costs and, therefore, neither they, nor the individual condominium unit owners, to whom their costs will eventually be passed, are entitled to any credit for those costs. See Piscataway Apt. Assoc. v. Piscataway Tp., supra. However, the existing record does not provide an adequate basis for us to determine whether Luv and Stonegate *175 were treated differently than other property owners with respect to the off-site sewer lines and whether the total contributions towards the system costs required of the developers of these complexes were arbitrary and discriminatory in comparison with charges assessed against other users. A remand to the trial court is therefore necessary for the taking of additional evidence and the making of findings of fact and conclusions of law consistent with the principles discussed above. In this regard, we point out that if it is determined on remand that a credit is due either Luv or Stonegate, the trial judge should then consider whether in the circumstances it would be just and equitable to now require that such credit in fact be given. It appears that because these developments have been assessed in their entirety as a single unit from the time they connected to the Stanhope system until the 1981 ordinance became effective, both Luv and Stonegate have received an unjustified windfall. Moreover, neither Luv nor Stonegate previously complained of or sought credit and hence they now may be precluded from doing so by the doctrine of laches or the applicable statute of limitations.
Accordingly, the matter must be remanded to the trial court for further proceedings to resolve the following issues: (1) whether connection fees were charged to Luv and Stonegate and, if so, what the fees encompassed; (2) whether the off-site sewer lines constructed by the developers were accepted by Stanhope, and, if so, whether other utility users made comparable contributions, directly or indirectly, to construction of the Stanhope sewer system; (3) whether the total contribution towards the system costs required of the developers of Luv and Stonegate were arbitrary or discriminatory; and (4) whether in the circumstances here present the Luv and Stonegate developers and thus the purchasers of the condominium units in each complex are equitably and legally entitled to a credit for prior system costs, and, if so, in what amount?

*176 VI
Finally, there may be merit in the claim that Stanhope arbitrarily and capriciously billed Stonegate and its unit owners for the same sewer usage. There is no such merit in Luv's claim in this regard. Generally, a condominium association is responsible for "the maintenance, repairs, replacement, cleaning and sanitation of the common elements." N.J.S.A. 46:8B-14(g). Fulfillment of these responsibilities might necessarily involve the use of water by the association in and of itself and thus could trigger a sewer charge, particularly where, as here in Stanhope, the sewer charge is measured by water usage. The record reveals that Stonegate did, in fact, carry out its responsibilities under N.J.S.A. 46:8B-14(g). Although representatives of both associations testified that the association did not use water or create sewerage, Luv concedes that it has a "community pool for use by all the unit owners." This surely would produce sewerage, requiring use of the Stanhope system separate and apart from the individual unit owners. Therefore, the separate sewer charge to Luv was warranted. However, Stonegate does not have a pool and consequently, its claim of improper billing may be justified. Since the matter must be remanded to the trial court for further proofs and determination with respect to other issues, we direct that the trial judge take additional testimony on whether Stonegate uses water, particularly with respect to common areas, and instruct the trial court to redetermine whether Stanhope wrongly charged Stonegate for the same sewer use that it charged its unit owners.

VII
Since the remaining issues raised on this appeal are clearly without merit, no further comment with respect to them is necessary. See R. 2:11-3(e)(1)(E).

VIII
Accordingly, we affirm the judgment of the Law Division under review to the extent that it declares and determines that: *177 (1) the 1981 amendment to the Stanhope sewer ordinance treating condominium unit owners in the Luv and Stonegate complexes in the same way it treats single family residences and apartments is valid and enforceable; (2) the method of assessment of the costs of phase II of the sewer system determined by Stanhope was legal and (3) Stanhope properly billed its customers for the sewer usage in conformity with N.J.S.A. 40:14A-8. Except as so affirmed, the judgment is reversed and the matter is remanded to the trial court for further proceedings consistent with the views expressed in this opinion. We do not retain jurisdiction.
NOTES
[1] The Musconetcong Sewerage Authority was created by defendant Borough of Stanhope and the Borough of Netcong pursuant to the Sewerage Authorities Law, N.J.S.A. 40:14A-1, et seq. Thus, the provisions of this act govern the disposition of this appeal notwithstanding references in the brief filed by Luv and Stonegate to the provisions of the Municipal Authorities Law. N.J.S.A. 40:14B-1, et seq., L. 1957, c. 183, § 1, et seq.
[2] Where a municipality is experiencing financial difficulties with respect to its sewer account, Rutan Estates v. Belleville, supra, has left open the possibility that such an assessment scheme might be permissible. However, although there was testimony in the trial below that the sewer account had a deficit in 1981, there was no evidence of a deficit when phase II was commenced and thus the financial soundness caveat of Rutan Estates is inapplicable. In any event, even if the sewer account was financially strapped, the municipality would still be permitted to equitably assess the system costs against all users.
[3] Stanhope's witness testified that this ordinance was Ordinance No. 1969-106. In addition, the 1969 sewer user rate ordinance, Ordinance No. 1969-107, in Section 2(f) makes reference to a "sewer connection charge" to be fixed in accordance with "An Ordinance Regulating the Connection and Use of Sanitary Sewers in the Borough of Stanhope and Providing for Certain Inspection and Permit Fees."
[4] It should be noted that while the earlier users would not then have contributed to the payment of debt service charges by means of a connection fee, a percentage of their sewer usage assessment was still being allocated to meet these costs.