JOSEPH MEGLINO, PLAINTIFF-RESPONDENT, v. TOWNSHIP COMMITTEE OF THE TOWNSHIP OF EAGLESWOOD AND TOWNSHIP OF EAGLESWOOD, DEFENDANTS-APPELLANTS.

KAPLAN & SONS CONSTRUCTION CORP., KAPLAN AT REFLECTIONS, INC., HILLSIDE ESTATES, INC., PARK VILLAGE INC., CALTON HOMES AT SAYREVILLE, INC., PETER MOCCO, HERBERT A. GOTTFRIED AND PHYLLIS GOTTFRIED, HIS WIFE, BABETTE BOIG AND MICHAEL COLLUCCI, PLAINTIFFS-RESPONDENTS AND CROSS-APPELLANTS, v. BOROUGH OF SAYREVILLE, A MUNICIPAL CORPORATION IN THE COUNTY OF MIDDLESEX, STATE OF NEW JERSEY, DEFENDANT-APPELLANT AND CROSS-RESPONDENT.

Argued February 4, 1986—Decided July 2, 1986.

*Thomas E. Monahan* argued the cause for appellants (*Gilmore & Monahan,* attorneys; *Terry F. Brady* on the brief).

*James S. Rothschild, Jr.* argued the cause for appellant and cross-respondent (*Riker, Danzig, Scherer, Hyland & Perretti,* attorneys; *James S. Rothschild* and *Edward K. DeHope,* on the briefs).

*Anthony M. Sellitto, Jr.* and *Leonard W. Roeber* argued the cause for respondent (*Roeber & Sellitto,* attorneys).

*Stewart M. Hutt* argued the cause for respondents and cross-appellants (*Hutt, Berkow & Janowski,* attorneys; *Wayne J. Peck* on the brief).

*Paul H. Schneider* argued the cause for *amicus curiae,* State of New Jersey, Department of Environmental Protection (A–67) (*W. Cary Edwards, Jr.,* Attorney General of New Jersey, attorney; *James J. Ciancia,* Assistant Attorney General, of counsel).

The opinion of the Court was delivered by

O'HERN, J.

The central issue in these appeals is whether a municipality that operates its own water or sewer-treatment works may include in its rate or connection charges for a service area of the community a component to recover portions of the capital costs of the system.

The Appellate Division in *Meglino v. Township Comm. of Eagleswood,* 197 *N.J.Super.* 296 and Law Division in *Kaplan & Sons Constr. Corp. v. Borough of Sayreville* essentially held

that unless the municipality were to create an authority to operate the works, it could not include a capital-recovery factor in its rates or connection fees. Principal to these courts' concern was that a capital-cost component in the rate system partakes of the nature of a special assessment not imposed equally on every affected property owner, within the defined statutory procedure applicable to special assessments. The decisions noted that utility authorities have been expressly authorized to include such capital components in their rates and connection fees. The courts reasoned that the absence of a comparable express power in municipal enabling legislation limited the municipal operator of the water or sewer works desiring to impose charges to recoup the costs of construction in one of four ways: by incorporating a water or sewer authority, enacting a local-improvement ordinance, absorbing the cost generally, or through some combination of each to reach the desired result.

We believe, however, that the goals and purposes of the special-assessment measures can be harmonized with the municipal-ratemaking power in a way that enables a municipality to recover from a sector of the community a just and fair share of the costs of capital construction. Accordingly, we reverse the judgments below. Further consideration of the reasonableness of the schedule of rates and charges proposed by each municipality shall be conducted in accordance with this opinion.

I

The two cases present contrasting examples of the varied situations in which the problem may arise. The Borough of Sayreville is a community in mid-growth. Situated on the Route 9 corridor in Middlesex County, it has a strong existing industrial base and growing commercial and residential potential. It has owned and operated a water works and sewer-treatment system since the early part of this century. Sayreville constructed those systems in part with bond proceeds and in

part with cash out of revenues created from its general tax base. For many years it included the entire costs of owning, operating, and retiring the incurred costs of building the sewer-system works in its general operating budget. Although the Borough constructed the water system in part as well with general revenue and bond proceeds, it also imposed water service charges upon customers to recover its cost.

The Township of Eagleswood, on the other hand, was until recently a rural community. Located in southern Ocean County between the Pinelands Reserve and Little Egg Harbor, it does not have a strong industrial or commercial base. It has never had city sewers. The Township's setting attracted a number of year-round and summer residents to its waterside.

Each of these communities has chosen to deal with its needs in different ways. Eagleswood's first concern was to combat an increasing source of water pollution that arose from the development of a portion of its community known as the Dock Road area. This portion of the town, along Barnegat Bay, is characterized by moderately intense residential development. Building elevations are actually below mean sea level. The geologic conditions are uniquely unsuited for continuing septic treatment. The municipality applied for and received approval to construct a collection system to serve the estimated 175 users in the Dock Road area. The Ocean County Sewerage Authority's plan is to provide interception and treatment services for the less-developed area of the county. Eagleswood, like other southern Ocean County municipalities, need only get its waste into the county interceptor.[1]

----

[1]Not before us is a problem presented to the lower courts concerning the Township's requiring participating property owners to sign a "Grinder Pump Agreement." Each of the dwellings involved was below an appropriate grade for gravity flow to the Ocean County sewer system. Impeller pumps had to be located on each of the properties to get the waste up to an appropriate grade where it could be carried to the county interceptor. The agreement permitted the Township to install and maintain the unit on the property, with title to the pump remaining in the Township. In addition, the homeowner would have to

The Township of Eagleswood proposed an approximately $1.4 million project that would pick up the wastewater from the Dock Road area and carry it to the county interceptor. It applied for and received federal and state funding in the form of loans and grants in the following sums: an $818,075 EPA grant, a $78,849 DEP grant, and a $340,700 loan from the Farmers Home Administration. That left an unfunded balance of $147,000. The latter two items prompted this litigation. In constructing its rate schedule, Eagleswood introduced an ordinance with two features that are relevant here. First, it proposed an annual rate charge that would include capital recovery of the FmHA loan. Together with estimated operating expenses, the total annual charge was proposed to be $354 per year, per home. Second, it proposed a one-time connection charge in the amount of $600 per dwelling, designed to recoup the $147,000 incurred by the municipality in extending the works to this area.

The plaintiffs are some of the residents of the Dock Road area. In addition to challenging the impeller-pump agreement as mentioned above, *supra* n. 1, they challenged the rate schedules and connection charges in the Superior Court. The trial court held that the Eagleswood ordinance provided for a "fair and equitable means of funding" the connection project. It found the general language of *N.J.S.A.* 40:63-7 to be sufficient authority for a municipality to assess the unreimbursed costs of the project against its initial users.

On appeal, the Appellate Division reversed. In that court's view the municipality had the power to construct the sewers as a public improvement, but not to impose the proposed charges to pay for the improvement. The court held that *N.J.S.A.*

---

allow access by Township personnel to the pump location. The property owners contended that the agreement's terms constituted a taking of property without just compensation. Both the trial court and the Appellate Division rejected this argument and we do not address it here.

40:63–7 "cannot be read as delegating to municipalities the unregulated right to recoup the cost of *construction* of a system." *Meglino v. Township Comm. of Eagleswood,* 197 *N.J.Super.* 296, 305 (1984) (emphasis in original). Specifically, the court found that

> [f]or that purpose the Legislature has given a municipality four options; first, to create a municipal utility authority under *N.J.S.A.* 40:14A–1 *et seq.;* second, to enact a local improvement ordinance under *N.J.S.A.* 40:56–1 *et seq.;* third, to absorb the cost of the sewer system as a general improvement; and, fourth, to use a hybrid approach, financing part of the costs locally and the balance generally. [*Id.*]

Sayreville has a different problem. It has an existing water and sewer-treatment works but both facilities are at or near capacity. Moving to provide service to new areas of the community, the Borough proposed by ordinance that new connectors to the system pay a one-time connection fee designed, in the municipality's view, to represent a fair-share contribution that would place new customers on an equal footing with those whose user fees and taxes had contributed to construction of the existing works. Plaintiffs are a group of developers and purchasers who will be affected by the charge. They contend that the proposed permit-connection fees of $500 for the sewer system and $590 for the water works are unauthorized charges that discriminate against new developments and exceed the municipal power. While the Sayreville case was pending in the trial courts, *Meglino* was decided by the Appellate Division. Bound by that decision, the trial court in *Kaplan & Sons* concluded that the proposed connection fees could be imposed only either by an authority or through the special-assessment or general-assessment procedures discussed in the *Meglino* opinion. It therefore granted summary judgment in favor of the developer-plaintiffs.

We granted certification to review the Appellate Division judgment in *Meglino,* 101 *N.J.* 290 (1985), and we granted direct certification of the *Kaplan & Sons* case, 101 *N.J.* 293 (1985),

because of the similarity of issues. The cases were scheduled for argument and disposition together.

## II

We must note at the outset the limited role that courts have in reviewing municipal rates for utility services. "[A]n ordinance establishing [such] rates * * * will be upset only if patently unreasonable." *H.P. Higgs Co. v. Borough of Madison*, 188 *N.J.Super.* 212, 222 (App.Div.), *certif. denied*, 94 *N.J.* 535 (1983); *see Seton Co. v. City of Newark*, 194 *N.J.Super.* 499, 506 (App.Div.), *certif. denied*, 99 *N.J.* 152 (1984). The principle applies equally to the provisions of sewer and water service. *See Freehold Borough v. Freehold Township*, 193 *N.J.Super.* 724, 727–28 (App.Div.1984) (" '[a] municipality has plenary statutory power to charge for the use of sewerage facilities, * * * subject only to the general restriction against patent unreasonableness' ") (quoting *Crowe v. Mayor & Council of Sparta*, 106 *N.J.Super.* 204, 206 (App.Div.), *certif. denied*, 55 *N.J.* 79 (1969)).

The reason that courts should defer to municipal decisions as to how to operate their utilities (at least within municipal boundaries) stems from the structure of government. Unlike those of private utilities, the rates that municipal utilities charge their customers are not subject to review by the Board of Public Utility Commissioners. "In such cases the Legislature may not regard the need for local consumer protection as compelling. If the resident consumer-voter does not like the management or the rates, he can vote the governing body out of office, and thus achieve reform." *In re Complaint by Township of Morris*, 49 *N.J.* 194, 204 (1967) (citation omitted). Within these parameters we review the two classes of charges proposed here.

The accounting principles applicable to public water or sewer rates and connection fees were described in broad outline by Justice Haneman in *Airwick Indus., Inc. v. Carlstadt Sewerage Auth.*, 57 *N.J.* 107, 120 (1970), *appeal dismissed, cert.*

*denied,* 402 *U.S.* 967, 91 *S.Ct.* 1666, 29 *L.Ed.*2d 132 (1971). The purpose of annual charges "is to raise a sum sufficient to pay (1) all expenses of operation and maintenance and (2) the principal and interest on any bonds and to maintain reserves or sinking funds for the funding of the [utility] Authority debt." 57 *N.J.* at 120. The former charge reflects the actual use of the system for water or sewerage disposal. The latter has its source in the original construction and installation costs for which bonds presumably were issued and sold. The principal and interest on these obligations represent that cost. *Id.*

The *Airwick* Court found it apparent that there should be two sources from which to raise the required funds in order that the charges remain equitable and uniform. *Id.*[2] It reasoned that those properties actually using the system should alone absorb the cost of operation and maintenance since the expenditure for such purposes arises solely for that use. On the other hand, all properties, whether actually tying into the system or not, should absorb the debt cost. 57 *N.J.* at 120.

The basis for the Court's conclusion lay in the fact that the debt represents the costs of construction and installation, from which every property receives some benefit and increase in value. *Id.* The Court noted that part of the construction costs are obviously necessary to provide for adequate future service for unimproved properties as well as improved lands. The Court concluded that unimproved properties, therefore, although not making any present use of the facilities, do not fail to receive a present benefit. 57 *N.J.* at 120–21.

---

[2]*Airwick* concerned a challenge to fees set by a municipal sewerage authority. The statute controlling such authorities requires that the rents, rates, fees, and charges assessed by same shall be both equitable and uniform throughout the service area. *N.J.S.A.* 40:14A–8(d) ("[r]ents, rates, fees and charges * * * shall as nearly as the sewerage authority shall deem practical and equitable, be uniform throughout the district for the same type, class and amount of use or service * * *").

In the *Airwick* Court's view, "[a]ll properties within the section serviced are beneficiaries of the expenditure * * *." *Id.* at 121. Both improved and unimproved property receive an immediate enhancement in value from the mere existence of the system and the only equitable manner in which to distribute the original cost is for the two categories of properties to be fairly called upon to pay for the original construction cost. 57 *N.J.* at 121. Noting that the statutory rents, fees, or charges provided by *N.J.S.A.* 40:14A–8(b) deal only with charges to the actual user of the system, the Court nevertheless reasoned that the statutory authorization for a connection or tapping fee could be used to make provision for debt service as well. *Id.* The Court concluded that the authority may therefore include as part of the connection fee a sum of money that will represent a fair contribution by the connecting party toward the debt service charges theretofore met by others. The Court emphasized that there need not be precise mathematical equality but rather "rough equality, keeping in mind that we are in an area in which, as with respect to other tax impositions, absolute equality is neither feasible nor constitutionally vital." *Id.* at 122. Accordingly, the *Airwick* Court sustained an escalating connecting fee to be charged to the unimproved properties in the sewer service area as they connected to the system.

Although formulated in the context of a sewerage authority, the accounting principles of *Airwick* are sound and remain the fundamental premise by which we should approach municipal water or sewer utility accounting. (Hereafter when we use the phrase "municipal utility," we do so in the context of this opinion as a municipally-operated water or sewer service not under the authority form.)

We shall therefore consider the connection charges proposed in both the Sayreville and Eagleswood cases and thereafter the annual service charges proposed in *Meglino.*

A. *May a municipal utility impose a connection fee for the privilege of tying into a new or existing system?* [3]

At least insofar as existing systems are concerned, it appears to have been assumed that, provided there is equality of treatment, a municipal utility may impose a reasonable connection fee for the privilege of tying into the system. *Colonial Oaks West, Inc. v. Township of East Brunswick*, 61 *N.J.* 560, 567 (1972) (upholding a $120 fee that included "a portion of the cost of increasing the capacity of the township's water supply and system in order to provide the * * * service"). That a municipality could impose such a charge was implicitly suggested in *S.S. & O. Corp. v. Township of Bernards Sewerage Auth.*, 62 *N.J.* 369 (1973), where the Court held invalid a $900 connection fee, but did so because it "irrationally distinguished between 'development' homes and similar dwellings in the community connecting within the same time period." *Trump Plaza Corp. v. Atlantic City Mun. Util. Auth.*, 192 *N.J.Super.* 376, 386 (Law Div.1983) (citing *S.S. & O. Corp., supra*, 62 *N.J.* 369); *see also Piscataway Apartment Ass'n v. Township of Piscataway*, 66 *N.J.* 106, 108–09 (1974) (upholding municipal power to impose costs of constructing lateral sewer lines on new connectors).

The further significance of *S.S. & O. Corp.* is its reliance upon Justice Mountain's opinion in *Deerfield Estates, Inc. v. Township of East Brunswick*, 60 *N.J.* 115 (1972). Although invalidating East Brunswick's effort to impose the cost of water improvements upon a subdivision developer, *Deerfield* recognized the municipal power to meet the costs of construction in three ways:

---

[3] In this regard, we emphasize again, as Justice Schreiber did in *White Birch Realty Corp. v. Gloucester Township Mun. Util. Auth.*, 80 *N.J.* 165, 179 n. 2 (1979), that "connection fee refers to the capital contribution to be made by the new customer for the privilege of tying in to the existing system and not the actual cost of the tap and the lateral from the main to the curb or the property line." No one questions the authority of a municipal utility to impose a reasonable charge for the tap-in.

> There are three principal ways that a water main extension project may be financed. First, it may be undertaken entirely at municipal cost and expense. * * * In the second place the municipality may undertake the project as a local improvement and assess the cost against the owners of the properties benefited pursuant to the procedure outlined in *N.J.S.A.* 40:56–1, *et seq.*
>
> The third course is to require that the work be done at the expense of the developer either with or without a formula providing for partial or total reimbursement. Recourse to this third alternative, as to which there has hitherto existed some question, may be had only where appropriate [municipal] legislation permits the imposition and when it is fair and equitable that this be done. [60 *N.J.* at 131 (footnote omitted).]

The overarching theme that permeates the third course is that it be "fair and equitable." *Id.* This is the same theme sounded in *Airwick Indus., supra,* which emphasized the "equitable and uniform" nature of the charges required. 57 *N.J.* at 120. It was echoed in the holding of *S.S. & O. Corp., supra,* in which the Court would have sustained equal connection fees, but found that a charge that was $700 or $900, depending upon whether the property was an individual dwelling or part of a development, was not fair and equitable. 62 *N.J.* at 383–84. Finally, the theme was repeated by Justice Schreiber in *White Birch Realty, supra:* "[t]here may be any number of ways in which a computation of a fair share can be fixed, and a utilities authority is free to adopt any one which will accomplish the result of fairly apportioning system costs among the users." 80 *N.J.* at 176–77.

In upholding the rates and fees imposed below, the trial court in *Meglino* expressly recognized, in its oral opinion, the principles outlined above: "regardless of what method [of financing] is chosen, equality of treatment is obviously the polestar found in all of the cases cited to this issue." We agree. Provided charges are fair and equitable, we believe a municipal utility may impose a rate or connection fee that includes a capital-recovery component. The same rationale should apply regardless of whether the municipality seeks to finance the expansion of an existing system, or the creation of a new one. This Court has never imposed on municipalities an orthodoxy of ratemaking. *H.P. Higgs Co. v. Borough of Madison, supra,* 188 *N.J.Super.* at 224–25 (rates imposed by municipality are not

suspect "merely because they diverge from those followed elsewhere"). Nor has it been enough that a court "differed from [the municipality] as to the basis for the rates. This is not the function of a court in reviewing whether the fixing of rates was arbitrary or unreasonable. By their very nature sewer rates cannot be fixed so that they will apply with exactness." *Phoenix Assocs., Inc. v. Edgewater Park Sewerage Auth.*, 178 *N.J.Super.* 109, 121 (App.Div.1981), *aff'd sub nom. Phoenix Apartments, Inc. v. Edgewater Park Sewerage Auth.*, 89 *N.J.* 2 (1982).

The property owners, however, contest the relevance of the principles of *Airwick*, *S.S. & O.*, and *White Birch*, claiming there is an absence in *N.J.S.A.* 40:63–7 and 40:62–78 of language that parallels the provisions of authorities law authorizing the imposition of connection charges for water and sewer systems.[4] For example, they note that the language of *N.J. S.A.* 40:63–7 refers to the imposition of rents or charges for usage, while, in contrast, the language of *N.J.S.A.* 40:14A–8, governing sewerage authorities, and *N.J.S.A.* 40:14B–21 and

---

[4]*N.J.S.A.* 40:63–7 provides:

> The governing body shall have entire control and management of all sewers and drains therein, owned or controlled by it, and may, from time to time, enlarge, increase, extend, renew, alter, replace, repair, cleanse, equip, operate and maintain any and all sewers and drains and all other such works and structures mentioned in section 40:63–1 of this title, owned or controlled by the municipality. It may, by ordinance, fix and prescribe such charges, rents, rules, regulations, conditions and restrictions as to connection with and use of sewers and drains in the municipality, as it may deem proper and necessary.

*N.J.S.A.* 40:62–78 similarly makes property owners liable for

> the payment of the price or rent as fixed by the governing body for the use of water by such owner, or by the occupier, and for the installation, purchase price, repair and testing of any water meter, water service, connections, appliances or parts, and renewals thereof, heretofore or hereafter furnished or made by the municipality, or any department thereof, in or upon such house, tenement, building or lot or connecting therewith, and the interest and penalties charged.

\* \* \* \* \* \* \* \*

–22, governing municipal water and sewage-disposal authorities, specifically refers to authority to charge and collect rents, rates, fees, or other charges for direct or indirect connection.[5]

The court below noted that the authorities-law provisions, *N.J.S.A.* 40:14A–8, :14B–21 and –22, were amended to specifically empower utility authorities to charge connection fees as a means of recouping capital costs, but that similar statutes governing municipal utilities were not so amended. It consequently concluded that the latter, absent authority form, necessarily lacked a similar power. *Meglino, supra,* 197 *N.J.Super.* at 304–05.

That argument, however, runs counter to other principles relevant to the relationship between a municipality and an

---

[5]*N.J.S.A.* 40:14A–8 provided in pertinent part:

   (a) Every sewerage authority is hereby authorized to charge and collect rents, rates, fees or other charges (in this act sometimes referred to as "service charges") for direct or indirect connection with, or the use or services of, the sewerage system.

   \* \* \* \* \* \* \* \*

   (b) \* \* \* In addition to any such periodic service charges, a separate charge in the nature of a connection fee or tapping fee, in respect of each connection of any property with the sewerage system may be imposed upon the person making such connection or upon the owner or occupant of the property so connected.

   \* \* \* \* \* \* \* \*

Similarly, *N.J.S.A.* 40:14B–22 authorized

   a separate charge in the nature of a connection fee or tapping fee, in respect of each connection of any property with the sewerage system may be imposed upon the person making such connection or upon the owner or occupant of the property so connected. Such connection charges shall be uniform within each class of users but the amount thereof shall otherwise be entirely within the discretion of the authority in order that the combination of such connection fee or tapping fee and the aforesaid sewer service charges shall meet the requirements of section 23 (C. 40:14B–23).

Parallel provisions are contained in *N.J.S.A.* 40:14B–21, governing water-service charges.

Recently, the Legislature enacted *L.*1985, *c.* 526, which amended the foregoing provisions to add a new uniform formula to be followed by utility authorities in imposing connection fees. *See* Part II, *infra* at 1143.

authority discharging these essential functions. As Justice Heher said in another context, "[a]n objective analysis of the relation between these several governmental units and the nature of the service in the context of the statutory policy reveals the fallacy of plaintiffs' reasoning." *County of Camden v. Pennsauken Sewerage Auth.* 15 *N.J.* 456, 468 (1954). In that Court's view, utility authorities serve as *alter egos* of municipalities in the service of essential public needs. *Id.* at 465. "While a separate and distinct economic and governmental unit, [a municipal sewerage or utility authority] is but the means of discharging the local governmental responsibility for the public health, comfort, convenience and welfare * * *." *Id.* There appears to be no reason to conclude that the Legislature would have intended to constrain municipalities in the discharge of the same essential governmental functions.

This Court has held that we should not assume the Legislature intended its grants of power to municipalities to be limited by existing states of technology or management. "We are enjoined by the Constitution * * * [and] the Home Rule Act * * * to interpret statutes liberally in favor of the existence of local power to deal with local needs." *Whelan v. New Jersey Power & Light Co.*, 45 *N.J.* 237, 251 (1965) (sustaining municipality's power to enter into hydro-electric power contract with regional utility company).

Further, our courts have regularly looked to authority law for guidance as to municipal ratemaking, *H.P. Higgs Co., supra*, 188 *N.J.Super.* at 226–27, and the path of the law with respect to the appropriateness of connection fees has proceeded on parallel courses. Authority law has been informed by reference to municipal law. *See S.S. & O. Corp., supra,* 62 *N.J.* at 380–82 (drawing analogy between connection fees charged by sewerage authority and those imposed by municipality for water service); *Ellis v. Larchmont Pharmacy Plaza, Inc.*, 208 *N.J.Super.* 359, 363–64 (App.Div.1986) (same); *Reahl v. Randolph Township Mun. Util. Auth.*, 163 *N.J.Super.* 501,

513–14 (App.Div.1978), *certif. denied,* 81 *N.J.* 45 (1979) (liberally construing Municipal Utilities Authorities Law to facilitate dealing with local concerns). Municipal law, in turn, has been informed by reference to authority law. *Luv Condominium Ass'n v. Borough of Stanhope,* 192 *N.J.Super.* 159, 165–66, 169–71 (App.Div.1983) (invoking authorities law to determine whether municipally-imposed sewer charges, rates, and connection fees were appropriate). Given these principles, we cannot agree that the Legislature intended to give municipalities less of an ability to recoup capital costs than that given a municipal utilities authority.

It has been contended before us that allowing municipalities to charge connection fees as a capital-cost-recovery mechanism would subvert the democratic safeguards—most notably the public-hearing provisions—of utilities authority law and the provisions of *N.J.S.A.* 40:56–21 to –30 governing assessments for local improvements. The contention that municipalities would be less accountable under the proposed scheme is unpersuasive. First, it overlooks that under *N.J.S.A.* 40:49–2, municipalities, no less than authorities, must proceed by advertisement in the local paper and open public hearing before final passage of any ordinance fixing rate or connection charges. *Manning v. Borough of Paramus,* 37 *N.J.Super.* 574, 580 (App.Div.1955). And, as noted earlier, if community members object to the fees or rates imposed by a municipality, they ultimately retain the power to induce reform at the local level through elections. *In re Complaint by Township of Morris, supra,* 49 *N.J.* at 204. We note, in addition, that management accountability within the authority structure has been called into serious question. *See* State Commission of Investigation, *Report and Recommendations on County and Local Sewerage and Utility Authorities* 385 (1983) (discussing "the multitude of ills that plague sewerage authorities").

However, there is one substantive concern implicated by the analogy to special-assessment law that occasions us to limit the sweep of our decision to the records before us. Underpinning

the special-assessment law is the constitutional principle that "[e]xaction of more than the special benefit to the property owner would constitute a taking of private property for public use without compensation." *McNally v. Township of Teaneck,* 75 *N.J.* 33, 43 (1977). Consequently, special-assessment law requires that a proposal to specially assess property shall include a statement of the costs actually incurred in making the improvement less contributions by other governmental agencies or sources, and concludes that

> [t]he total amount of the assessment levied upon the real estate benefited by the improvement shall not exceed the cost thereof, less any such payment or contribution. If the benefits so assessed shall not equal the cost less such contribution the balance shall be paid by the municipality. [*N.J.S.A.* 40:56–24.][6]

Recent amendments to *N.J.S.A.* 40:14A–8, :14B–21, and –22 now provide a uniform method for calculating a permissible fair share connection fee. Although the amendments, *L.*1985, *c.* 526, are limited in application to utility authorities, and therefore are not controlling of municipally operated utilities, the formula reflects the overriding principles that are applicable here. The Senate Committee on County and Municipal Government stated in amending the authority-law provisions:

> Under the uniform connection fee formula established by this bill, a connector will pay a charge based upon the actual cost of the physical connection, if made by the authority, plus a fair payment towards the cost of the system. The fair payment is to be computed by deducting from the total debt service and capital expenditures previously made by the authority the amount of all gifts, contributions or subsidies received by the authority from any federal, State or local government or private person. The remainder is then divided by the number of service units served by the system, and the results are apportioned to the connector based upon the number of service units attributed to him.
>
> The bill requires that, in attributing service units to a connector, the estimated daily flow of water or sewerage for the connector shall be divided by the

---

[6]Special assessments must also "be as nearly as may be in *proportion to* and not in excess of the peculiar benefit, advantage or increase in value which the respective lots and parcels of real estate shall be deemed to receive by reason of such improvement." *N.J.S.A.* 40:56–27 (emphasis supplied). The proportionality that may be of grave concern in some circumstances, *see Ridgewood Country Club v. Borough of Paramus,* 55 *N.J.* 62, 68–70 (1969), does not seem at all implicated in either of the situations before us.

average daily flow for an average single family home in the authority's district. This permits the authority to attribute a larger number of service units to a commercial building, for instance, than to a single family home. [Senate County And Municipal Government Comm., *Statement to S. 1487* (1984).]

Because of the similarity of principles involved, and because the Legislature has mandated that in making special assessments municipal governments bear the cost of necessary public improvements that exceed the local benefit, we do not contemplate that municipalities will seek to use connection fees in a way that would contravene that statutory policy.

In most cases we believe that insistence upon equality of treatment in the imposition of water and connection fees will coalesce with the concerns of special-assessment law. *Rutan Estates, Inc. v. Town of Belleville*, 56 *N.J.Super.* 330 (App. Div.), *certif. denied*, 30 *N.J.* 601 (1959), illustrates that point. In that case, Belleville proposed to assess specially the last remaining portion of the community for the extension of water and sewer service, a charge it had never imposed on any other region of the community. 56 *N.J.Super.* at 333–34. Because there was not equality of treatment, the court refused to permit the special-assessment procedure to be invoked. *Id.* at 336. Judge Gaulkin explained:

> We need not determine in this case whether a municipality must pay for the extension of mains in every instance in which its water utility is operating at a profit and the extension will be a sound investment. All we need, and do, determine here is that when water mains have been built throughout a municipality without assessment and the water utility is in the position here stipulated it is arbitrary and discriminatory, and therefore unlawful, to demand that the last remaining unserved parcel, representing a small fraction of the municipality's total area, pay for the extension of mains to serve it. [*Id.*]

Hence, we perceive that the symmetry of the two concepts can be recognized in the municipal-ratemaking process. The concepts have been viewed as interrelated. *See Lake Intervale Homes, Inc. v. Township of Parsippany-Troy Hills*, 28 *N.J.* 423, 441–42 (1958) (municipal ordinance imposing cost of water main extension on developer invalidated because of lack of standards analogous to those in a local-improvement ordinance); *see also Divan Builders, Inc. v. Planning Bd. of Wayne*, 66

*N.J.* 582, 603 (1975) (off-site drainage requirement set aside because of "disregard of the fundamental principle prohibiting discrimination in cost apportionment"). In each case the fundamental issue is fairness in apportioning the expenses. *Cf. Drake v. Town of Boonton,* 106 *N.J.Super.* 79, 84–85 (Law Div.1969) (while municipality has power to charge single individual for cost of constructing water main to property, it must provide mechanism for reimbursement if other owners subsequently tap into main).

With the qualification noted that we find nothing in this record that suggests that the costs imposed will exceed the benefits provided, we hold that pursuant to *N.J.S.A.* 40:63–7 and :62–78, a municipality may recoup a fair share of capital costs from residents seeking to tie in to an existing or new water or sewer system.

   B.  *May a municipal utility include in its annual operating charge a component to recover costs of capital construction?*

This point was expressly left undecided in *Crowe v. Mayor & Council of Sparta, supra,* because, in the circumstances of that case, the municipality was not actually recovering original capital costs through its sewer rates. 106 *N.J.Super.* at 206. Still, the court permitted inclusion in the rate base of what is substantially the same item—a provision for depreciation allowance. *Id.* We perceive no substantive difference in the principles. In essence, the obligation of a municipal utility is "to establish a fair rate to the users so that [it] may receive a just return on the fair value of its property and so that the public is not burdened with unreasonable costs." *H.P. Higgs Co. v. Borough of Madison, supra,* 188 *N.J.Super.* at 228. As noted, our law has never imposed an orthodoxy of ratemaking on municipalities and our courts have regularly looked to authority law for guidance. *Id.* at 227 (citing *Reahl v. Randolph Township Mun. Util. Auth., supra,* 163 *N.J.Super.* 501). Under provisions applicable to authority law, recovery of capital

costs in the rate structure is clearly appropriate. *See Airwick Indus., Inc. v. Carlstadt Sewerage Auth., supra,* 57 *N.J.* at 121–22; *White Birch Realty Corp. v. Gloucester Township Mun. Util. Auth., supra,* 80 *N.J.* at 171; *see also P.J. Ritter Co. v. Mayor of Bridgeton,* 135 *N.J.L.* 22, 33–34 (Sup.Ct.1946), *aff'd,* 137 *N.J.L.* 279 (E. & A.1948) (analogizing municipal-utility and private-utility ratemaking). That municipalities could recover capital costs in utility rates appears to be the practice heretofore followed by our courts. *See Gabriel v. Borough of Paramus,* 45 *N.J.* 381, 389 (1965) (annual sewer charges included debt-service component). Since 1983, municipal water utilities have been required to establish rates that include, among other things, recovery of capital expenditures and debt service. *N.J.S.A.* 40:62–77. According to tables contained in a recent report of the New Jersey Division of Local Government Services, most of the state's municipalities now recover some portion of the debt service for municipally-owned utilities from rate charges. *See* New Jersey Division of Local Gov't Services, *46th Annual Report* 665–72 (1983).[7]

We therefore do not believe that it is inappropriate for a municipality to include a capital-cost-recovery item in utility ratemaking, subject to the overall requirement that the rates be "free from patent unreasonableness." *Piscataway Apartment Ass'n v. Township of Piscataway, supra,* 66 *N.J.* at 109.

### III

We turn then to the application of these principles to the specific facts of the cases before us.

---

[7]There might be a case in which it could be shown that the capital component of the annual rate was unreasonable.

It is certainly not equitable for the improved lands, during their use of the system, to pay the entire original installation and construction cost, thereby paying for the present and future benefit received and to be received by the unimproved properties as well. [*Airwick Indus., Inc. v. Carlstadt Sewerage Auth.,* 57 *N.J.* 107, 121 (1970), *appeal dismissed, cert. denied,* 402 *U.S.* 967, 91 *S.Ct.* 1666, 29 *L.Ed.*2d 132 (1971).]

A. *The Sayreville Sewer-Connection Fees.*

Because the Sayreville sewer-connection case proceeded on summary judgment, the trial court had no occasion to resolve the factual issues before it concerning whether the fees were "fair and equitable."

The Borough characterizes the proposed fee as being in the nature of an equalization charge. In *White Birch*, this Court analyzed a similar equalization charge in the context of a utilities authority. There, a municipal utilities authority sought to impose sewer-connection charges upon two real estate developers seeking to connect their developments to the existing sewerage system. 80 *N.J.* at 168–69. In calculating "the connector's fair share of the construction cost theretofore paid by prior users[,]" *id.* at 171, the Court adopted a methodology whereby monies attributable to the construction costs of the system, including debt service, would be treated as credits in favor of the prior connectors. The fair share of original construction costs and subsequent improvements or betterments to the system would then be assessed proportionately against the new connectors. *Id.* at 184.

Together with *Airwick, supra,* 57 *N.J.* 107, *White Birch* stands for the principle that connection fees may include some portion of actual costs of construction and debt-service charges sufficient to put the connecting parties on an equal footing with prior connectors' contributions to the debt service of initial construction. Concededly, this is not the only theory for such fees, *White Birch, supra,* 80 *N.J.* at 176–77, but it is the theory purportedly followed by Sayreville. Plaintiffs assert that they are already on an equal footing with other connectors because they paid the taxes on their property, which was assessed at a fair value that presumably reflected an enhanced value for the availability of sewers.

Sayreville's position is that whatever contribution the properties made through taxation while unimproved was insignificant compared to the contributions made by existing connectors of

improved properties. The parties dispute whether the Borough followed the *White Birch* rationale in that it calculated earlier connectors' contributions on the basis of total municipal principal cost rather than debt retired. The Borough contends that its connection fee is, in any event, less than an allowable one since it did not include interest on the retired debt. It argues further that other capital contributions of the Borough borne by improved properties should be considered lest there be a windfall to the later connectors.

In sum, the Borough states that it merely seeks equity between previous and new connectors as to contributions toward the capital costs of this system, arguing that if this were not allowed, developers such as Kaplan would be unduly enriched in those municipalities that have not created authorities. Since this case went off on summary judgment, we believe that it is premature to resolve these factual issues on the papers before us.

■ On a remand, consideration of actual equality will include the extent to which such fees are included as part of the purchase price of improved properties,[8] and analysis of the comparative position of the new connector vis-a-vis the old connector whose initial cost has been increased by repayment to the utility of original construction costs through tax payments. In this regard, the new connection-fee formula established by *L.*1985, *c.* 526, although not controlling in the context of municipally operated utilities, may nevertheless provide guidance to the parties in developing an equitable connection fee.

In addition, as noted, we have expressed the view that some consideration should be given to the principles of law applicable to special-assessment cases. *See Rutan Estates, Inc., supra,* 56 *N.J.Super.* at 336. Ordinarily, there is a presumption in a

---

[8]In *White Birch, supra,* 80 *N.J.* at 178–79, the Court noted that, in case of a recovery for excessive connection charges, there cannot be a windfall to developers who have passed the costs on to homeowners.

special-assessment case that the assessment is equivalent to the benefit conferred upon the property. It does not seem unreasonable to us to presume that property will be enhanced to the extent of the proposed $500 sewer-connection fee through the availability of a public sewer system.

### B. *The Sayreville Water-Connection Fees.*

■ A different factual situation is presented here because construction of Sayreville's water system has been financed in large part through the imposition of user fees, not through general taxation. As a result, not all property owners have contributed toward creation of the capital base; only those who have actually used the system have contributed. In exacting connection fees, the Borough may require that new connectors pay a proportionate share of original construction costs retired by prior connectors.

We note that the plaintiffs have raised a challenge to the methodology employed by the Borough to determine the capital contribution of prior connectors similar to the objections lodged against the sewer-connection fees. We do not attempt to resolve those factual issues on this record.

Finally, concern has been raised that the municipality will not, in fact, dedicate the funds to the equalization of benefit between improved and unimproved properties. Although this issue is not before us, the parties will want to consider the requirements of *N.J.S.A.* 40:62–2 that utility receipts be maintained in a separate schedule of accounts under appropriate principles of municipal-accounting law, and the willingness of the Borough, expressed before us, to dedicate these funds to equalization.

### C. *The Eagleswood Sewer-Connection Charge.*

■ A central concern presented with respect to this connection charge is that it may not be equally imposed upon all properties in the Dock Road area. The ordinance provides no

escalating charge, as in *Airwick Indus., Inc., supra,* 57 *N.J.* 107, for those properties to be connected at a later date: the $600 connection fee is based on 245 estimated hookups, but at the time of the trial it was stipulated that there would be only 175 initial users, which could result in a higher connection fee. To the extent that the municipality would propose that current users absorb the entire cost without consideration of future connectors, there is an inconsistency with the *Airwick* methodology. This was a point of concern not only to us, but to the trial court as well. The Township asserts that it doubts that any future properties can be developed in the Dock Road area because of environmental controls imposed by the State's coastal-protection programs. While we refuse to decide the propriety of the connection fees on the record before us, we do note that in any future proceedings, the Township must make its best effort to estimate future connectors; if future connectors are anticipated, the municipality should reconsider its attempt to recover all of its costs from the initial connectors to the new service area.

Further, we were advised at oral argument that the Township may have available to it Community Development Block Grant funds that may satisfy most or all of its additional funding needs for this project. That alone may radically revise the consideration of connection fees in the Dock Road area and obviate the need for further court proceedings. In connection with any revised ordinance, we would assume that the community will take into account both concerns addressed above.

### D. *The Eagleswood Annual Rate Charge.*

As noted earlier, Eagleswood proposed an annual sewer-rate charge on the Dock Road residents of $354 per year, a portion of which includes principal and interest on the FmHA loan. For the reasons stated above, we hold that the municipality has the power to recover these sums in its annual rate charges subject to the requirement that the charges be reasonable. But since we were informed at oral argument that the

capital sums involved may have to be revised, we proceed no further on this issue. We do note, however, that since recovery of these costs is done by way of annual rate charges, those charges may be readily adjusted to accommodate changed circumstances.

## IV

For the reasons stated, the judgments below are reversed. The Sayreville case is remanded for further proceedings in accordance with this opinion. Because the Eagleswood ordinance will be amended by virtue of the changed circumstances, the matter is not remanded to the trial court. Any further challenge to the new municipal ordinance will be conducted in accordance with this opinion.

*For reversal and remandment in the Sayreville case* —Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, O'HERN and STEIN—5.

*Not participating* —2.

*For reversal in the Meglino case* —Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, O'HERN and STEIN—5.

*Not participating* —2.