Dear Carroll A. Jones
On behalf of the City of Brunswick ("City"), you requested our opinion about the permissible use of revenues from fees charged for connection to the municipal water and sewerage systems. Specifically, you asked whether these revenues may be devoted only to capital infrastructure costs or whether they may also be used for operating costs of the City's water and sewerage treatment facilities.
Consistent with our policy governing opinion requests from local governments, you included with your request an opinion from the City Attorney. In that opinion, he stated that the City Charter authorizes the City to collect charges in accordance with State law and that neither the City Charter nor the City ordinances themselves limited the City's use of connection fees.[1] He identified the applicable State law governing the operation of City's water and sewer systems as Title 9, Subtitle 7 of the Environment Article ("EN"), Annotated Code of Maryland. However, he also pointed out that the Sewerage Facilities Bond Act, EN § 9-801 et seq., might be interpreted to allow use of connection fee revenues to cover "expenses of repair and maintenance of sewerage (not water) systems if such fees fall within the definition of `revenue from the sewerage facility'," had the City issued bonds under this statute. While the City Attorney concluded that revenue from connection fees is to be used for debt service, he stated that the answer to your inquiry is not clear cut and suggested that the City seek advice from this Office. Subsequently, we were advised by the City Administrator that the only outstanding debt that the City has for water or sewer infrastructure was not issued under either of the statutes identified in the City Attorney's opinion, but rather through State financing programs.
For the reasons explained below, under the City's current financing agreements, revenues from sewer connection fees are dedicated to debt service. In addition, we agree with the City Attorney that revenues from any connection charges that might be imposed under EN § 9-722(a) would be dedicated to debt service. Even if connection fees were to be imposed under other statutory authority, it is unlikely that the resulting revenues could be used for routine operating costs of the City's water and sewerage treatment facilities.
 I Background
When a customer initially hooks up to a public water or sewerage system, the customer is usually required to pay a connection fee. Generally, a connection fee is a one-time charge, although payment is sometimes deferred over time. See, e.g., Ward Dev. Co., Inc. v.Ingrao, 63 Md. App. 645, 651, 493 A.2d 421 (1985).
Various methods are used to compute connection fees. For example, it might reflect only the actual cost, or more likely, the average cost, to complete a physical connection between the main and properties served.See, e.g., Am . W ater W orks A ss'n, Principles of Water Rates, Fees,and Charges p. 181 (5th ed. 2000). But a connection fee may not necessarily be limited to the cost of the making the connection.See, e.g., Meglino v. Township Comm. of the Township of Eagleswood, 103 N.J. 144, 155 n. 3, 510 A.2d 1134 (1986). The charge might be set so that the new customer reimburses the municipality for a portion of the cost of capital required to provide the service or the cost to replace the capacity the new customer consumes. Roger J. Dolan, et al.,Managing the Water and Wastewater Utility p. 8-5 (2003); see also 12 McQuillin, The Law of Municipal Corporations § 35.55 (3rd
ed. rev. 2006). Revenue collected through connection charges is usually dedicated to capital expenses. Dolan, supra, at 9-9, 9-10.
We turn next to the statutory provisions governing the City's water and sewerage systems, including the permissible use of connection fees, and the statutory provisions governing the City's existing debt.
 II Municipal Water and Sewerage Systems
EN Title 9, Subtitle 7, Part II provides enabling authority under which a "municipal authority,"[2] such as the City, may construct and operate, among other things,[3] a water supply and sewerage system. Among the powers granted to a municipality under this subtitle is authority to construct, extend, or alter a water or sewerage system and the authority to maintain and operate a system. EN § 9-705. A municipality that constructs or establishes a water or sewerage system is to "[c]onstruct and provide at its own expense . . . a water service pipe or sewer connection that extends from the water main or sewer to the property line of each lot that abuts on a street or right-of-way in which the water main or sewer is laid." EN § 9-708(a)(1).
Subject to the approval of the voters in a referendum, a municipality may issue bonds to finance all or part of a system's design, construction, extension, alteration, purchase or condemnation. EN § 9-711(a) and (c).[4] To cover all or part of the debt service, the municipality may impose an annual front-foot assessment "against any property that abuts on any street, road, ally, or right-of-way in which a water pipe [or] sewer . . . is laid." EN § 9-713(a).[5] The municipality may also impose service charges to cover both debt service and "the cost of maintenance, repair, and operation" of a water or sewerage system, "including overhead expenses." EN § 9-714. To the extent that any front-foot benefit assessments or service charges do not pay the principal and interest on the bonds, the municipality is to levy a property tax to satisfy its debt service obligation. EN § 9-712.
EN Title 9, Subtitle 7, Part III grants additional authority to municipalities concerning water and sewerage services,[6] including explicit authority to impose connection charges. EN § 9-722(a)(1). That statute authorizes a municipality to "[e]stablish a reasonable charge that is not less than the actual cost . . . for connection with a water or sewerage system." Id. The statute also authorizes the imposition of annual assessments on all property, improved or unimproved, abutting any street, road, lane, ally, or right-of-way in which there is a water main or sewer. EN § 9-722(a)(2). Revenues resulting from assessm ents and connection charges under this statute are for "the payment of principal and interest on indebtedness that is incurred to finance any water or sewerage system." EN § 9-722(a). While these revenues are limited to debt service, unlike charges under Part II, they are not solely for bonds issued under EN § 9-711.
EN Title 9, Subtitle 7, Part III also authorizes a municipality to impose service charges. Subject to local charter provisions and statutory requirements, the municipality may set reasonable rates for water service and reasonable charges for sewer upkeep and sewer service, chargeable against properties served by a water line or sewer pipe that the municipality owns or supervises. See EN § 9-723 through § 9-727. The resulting revenue may be used for debt service, as well as the maintenance, repair, and operation of a water or sewerage system. EN § 9-723(a).
 III State Financing Programs
We understand that the City has secured funding for its water and sewer facilities through State financing programs. The financing agreements related to those loans can also affect the use of connection charges.
WQFA Programs
The Department of the Environment Water Quality Financing Administration ("WQFA") operates two loan programs through which it offers below market-rate loans to qualified borrowers, including municipalities: the Maryland Water Quality Revolving Loan Fund, EN § 9-1605, and the Maryland Drinking Water Revolving Loan Fund, EN § 9-1605.1. Both of these programs require that, as a condition of a loan, the local government establish a dedicated revenue source for the loan repayment. EN §§ 9-1605(d)(1)(iii) and 9-1605.1(d)(1)(i). The WQFA requires that the bonds evidencing a local government's loan provide a "double-barrel" security — that is, in addition to the pledged revenues, the bonds are backed by the local government's full faith and credit.See also EN § 9-1606(d) (authorizing a borrower to pledge any revenues that the borrower would be entitled to receive from the State).
We understand that the City currently has three outstanding loans from the Maryland Water Quality Revolving Loan Fund through the WQFA.[7] In financing agreements concerning those loans, the City has pledged sewer user charges, "including any and all fees for use of the public sewer system or connection to it," for repayment of the loans (emphasis supplied).[8]
Infrastructure Program
Under the Infrastructure Program, see Annotated Code of M aryland, H ousing and Community Development Article ("HCD"), §§ 4-220 and 4-228 through 4-233, a municipality may enter into an agreement with the Community Development Administration ("CDA"), a unit within the Department of Housing and Community Development, to finance infrastructure projects, including water and sewerage systems.See HCD §§ 1-101(i) (definition of "political subdivision") and 4-220 (qualifying infrastructure projects). Under this program, the municipality pledges "any money, including a share of income tax, that the [municipality] is entitled to receive from the State." HCD § 4-229(b)(1).
The City has two outstanding loans through this program. The agreement for the City's most recent loan pledges as security money that the City is entitled to receive from the State, including State-shared revenues, State-collected local taxes, the City's share of State tax es, including the State income tax, general purpose grants or payments, State highway user revenues, and any future program revenues replacing those programs in place at the time of the loan.[9] However, the primary security under the repayment agreement is the City's full faith and credit.
 IV Analysis
You have asked whether revenues from connection fees may be used to defray the operating costs of a system.
A s noted above, the City has outstanding financing agreem ents with the WQFA and the CDA Infrastructure Program. Revenues resulting from connection fees must be used consistently with any covenant made as part of these transactions or any other financing arrangement. For example, the WQFA loans funded through the M aryland Water Quality Revolving Loan Fund specifically required that the City pledge sewer connection fees for repayment of the loans.[10]
With respect to Title 9, Subtitle 7 of the Environment Article, the source of funding identified by the City Attorney, our analysis starts with the plain language of the statute — the "best source of legislative intent." Ross v. State Bd. of Elections, 387 Md. 649, 661, 876 A.2d 692
(2005). As noted above, EN §§ 9-714 and 9-723 specifically authorize the use of service charges to fund, among other costs, the costs of operating a water or sewerage system. In contrast, EN § 9-722 authorizes imposition of a connection charge "[t]o provide funds for payment of principal and interest on indebtedness that is incurred to finance any water or sewerage system. . . ." EN § 9-722(a). The statute requires that a connection charge be "reasonable" and "not less than the actual cost . . . for connection." EN § 9-722(a)(1). Thus, while a connection charge may exceed the actual cost of making the connection, nothing in the statute relates the charge to operating expenses or authorizes the use of revenues for operating expenses. Rather, the statute explicitly assigns those revenues to the payment of debt service.
The statutory provision requiring that connection charge revenues be dedicated to capital expenses is consistent with the underlying purpose of such charges, that is, requiring new customers to contribute a share of the capital costs of the system. See, e.g., 12 McQuillin, The Law ofMunicipal Corporations §§ 35.43 and 35.55 (3rd ed. rev. 2000) (water connection fees); 11 McQuillin, supra, §§ 31.30 and 31.30.15 (sewer connections). Routine operating costs, however, are not a capital expense. United States v. Michigan,483 F. Supp. 2d 561, 563 (E.D. Mich. 2007), citing Water Environment Federation, Financing and Charges for Wastewater Systems 28-9 (2004). It is difficult to see how routine operating costs could be funded out of connection charge revenues in a manner that would ensure a reasonable allocation of costs between existing and new customers.[11]
We have focused our response on the City's existing financing agreements and EN Title 9, Subtitle 7, the statutory provisions referenced by the City Attorney. There are other provisions under which the City might operate a water or sewerage system, finance water and sewerage infrastructure, and impose connection charges.[12] For example, Article 23A, § 2(b)(33) authorizes a municipal governing body to establish "reasonable fees and charges . . . [a]ssociated with the exercise of any governmental or proprietary function authorized by law to be exercised by a municipal corporation." Without cataloging each of these possible sources of authority, it is unlikely that connection fees imposed under any of those provisions could be used for operating expenses. Unless a particular statute authorized the use of connection fees for operating expenses, a "connection" charge would likely be considered a fee that must be reasonably related to the cost of connection or the capital costs of the system to which the user is connected. See Part I above.
 V Conclusion
Under the City's current financing agreements, revenues from sewer connection fees are dedicated to debt service and thus are not available for operating expenses. Revenues from any connection charges that might be imposed under EN § 9-722(a) would be dedicated to debt service. Even if connection fees were to be imposed under other statutory authority, it is unlikely that the resulting revenues could be used for routine operating costs of the City's water and sewerage treatment facilities.
 Douglas F. Gansler Attorney General
 William R. Varga Assistant Attorney General
 Robert N. McDonald Chief Counsel, Opinions and Advice
[1] We defer to the City Attorney's construction of local law.
[2] This term is defined as follows:
"Municipal authority" means:
 (1) The mayor and council of a municipality;
 (2) The town commissioners of a municipality; or
 (3) Any other governing body of a municipality.
EN § 9-701(b). Throughout the remainder of this opinion, we use the term "municipality" or City for brevity.
[3] The subtitle also authorizes the construction and operation of drainage systems and refuse disposal systems. See EN § 9-701(c) (definition of "system").
[4] Such bonds are tax-exempt, can have a term of maturity of up to 50 years, and are not subject to any limit on the total amount of municipal debt. The bonds are a lien on all property within the municipality. EN § 9-711(b).
[5] For purposes of such assessments, the municipality may classify property based on use; the annual rates may be altered year to year, but rates must be uniform within each classification. EN § 9-713(b)(3).
[6] This part applies, not only to municipalities, but also to counties and certain special districts that operate water and sewerage systems. See EN §§ 9-720 and 9-721. The authority under this part supplements any other authority available for financing water and sewerage systems. EN § 9-721(a).
[7] The City's loans through the Maryland Water Quality Revolving Loan Fund were closed on September 26, 1996, April 8, 2004, and January 27, 2005. We understand that the City has also applied for a loan from the Maryland Drinking Water Revolving Loan Fund.
[8] One loan agreement involving the 2nd Avenue and B Street Stream Restoration also includes water user charges as part of the dedicated revenue pledge.
[9] The pledge of revenues otherwise distributed by the State to the political subdivision facilitates collections. See HCD § 4-229(b)(2) (directing Comptroller and State Treasurer to pay pledged moneys to CDA or trustee designated by CDA).
[10] Other financing arrangements that the City might enter into could include pledge requirements with detailed flow of funds provisions specifically earmarking connection charges.
[11] Other State statutes addressing the use of connection charges generally limit the use of revenues to capital costs. For example, the law governing county sanitary commissions allows reasonable connection charges as well as benefit assessments to pay debt service. EN § 9-656. Subject to an individual county exception, excess connection charge revenues are only to be used for "repairs, replacement, and extraordinary expenses." EN § 9-661(g)(1); see also EN § 9-922 (water and sewer authority may charge reasonable tapping fee). The Washington Suburban Sanitary Commission is generally required to divide revenue from connection fees exceeding the actual connection costs between debt service and a contingency fund for "repair, replacement, or any extraordinary expense in the maintenance and operation" of its systems. Annotated Code of Maryland, Article 29, § 6-101; see Washington SuburbanSanitary Comm'n v. C.I. Mitchell and Best Co., 303 Md. 544, 565-66,495 A.2d 30 (1985) (Article 29 usually relates specific revenue-raising measures to identified costs).
To be sure, there are statutes that grant broader authority. For example, the Worcester County Sanitary Commission is authorized to use excess connection charge revenues for "any . . . purpose relating to the operation of the service area." EN § 9-661(g)(2). And, as noted by the City Attorney, the Sewerage Facilities Bond Act allows use of any sewerage facility revenues to cover operating costs — authority that might be interpreted as extending to connection charges for sewerage systems. EN § 9-812.
In his analysis, the City Attorney also cited an opinion of the Public Service Commission concerning a private water company, which suggested a narrower view of the appropriate use of connection charges. See LXXI Report of the Public Service Commission of Maryland 125 (1980). However, that opinion is consistent with the notion that connection fees should be dedicated to capital costs. Of course, the Public Service Commission lacks jurisdiction over rates charged by municipal water and sewerage utilities except under limited circumstances involving service beyond municipal limits. Annotated Code of Maryland, Public Utility Companies Article, §§ 4-304 and 4-305.
[12] A municipality could issue general obligation bonds or, if authorized by its charter, revenue bonds to finance water and sewer infrastructure pursuant to the Annotated Code of Maryland, Article 23A, § 31 et seq. A municipality, acting alone or in combination with another political subdivision could establish a public authority to be responsible for water or sewerage services. See EN § 9-901 et seq. A municipality could obtain water or sewerage services through a county sanitary commission. See EN § 9-601 et seq. A franchise might be granted to a private entity to provide water or sewerage services within the municipality. Article 23A, §§ 2(b)(13) and 2A(b). A municipality might also have authority under a public local law to provide water or sewerage service, provided the authority is not inconsistent with Part II of Title 9, Subtitle 7 of the Environment Article. EN § 9-704(a);see, e.g., Garrett County Sanitary Dist. v. Mayor and Town Council ofOakland, 249 Md. 400, 405, 240 A.2d 228 (1968). A municipality could also establish a special taxing district to fund water or sewer infrastructure. Article 23A, § 44A. *Page 137