No. 89-486

IN THE SUPREME COURT OF THE STATE OF MONTANA

1990

JAMES F. LECHNER, THE HOME BUILDERS ASSOCIATION OF BILLINGS, MONTANA, INC., a Montana corporation; KUMMERFELDT CONSTRUCTION, INC., a Montana corporation; DARWIN JOHNSON CONSTRUCTION, INC., a Montana corporation; HARLEY G. HOVEN; JERRY T. RAY, d/b/a Jerry T. Ray Development; S.D. HELGESON, INC., a Montana corporation; MACE REALTY and INSURANCE, INC., a Montana corporation; SCHOONER REALTY AND DEVELOPMENT, INC., a Montana corporation; KOBER CONSTRUCTION CO., a Montana corporation; MARK JOHNSON; PERFECT HOMES, INC., a Montana corporation; GERBASE, INC., a Montana corporation; PIERSON CONSTRUCTION, INC., a Montana corporation; MORA BROTHERS, INCORPORATED, a Montana corporation; J. JUNKERT CONSTRUCTION, INCORPORATED, a Montana corporation; WILLIAM KALE; RON WILLIAMS; DAUGHERTY CONSTRUCTION, INC., a Montana corporation; REDINGER AND SON, INC., a Montana corporation; GREENBRIAR CONSTRUCTION COMPANY; HARDY INC. BUILDERS, a Montana corporation; GLASSER CONSTRUCTION, INC., a Montana corporation; HANK C. GLASSER; STAN D. HELGESON; and RAY WEBER,

     Plaintiffs and Appellants.

     -vs-

THE CITY OF BILLINGS, MONTANA,

     Defendant and Respondent.

APPEAL FROM:  District Court of the Thirteenth Judicial District,
In and for the County of Yellowstone,
The Honorable Robert W. Holmstrom, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        Joe Gerbase argued, Anderson, Brown, Gerbase, Cebull, Fulton, Harman & Ross, Billings, Montana

    For Respondent:

        James L. Tillotson argued, City Attorney, Billings, Montana

Submitted: April 17, 1990

Decided: August 20, 1990

Filed:

FILED

AUG 2 0 1990

Ed Smith
CLERK OF SUPREME COURT
STATE OF MONTANA

_____
/ Clerk

Justice William E. Hunt, Sr. delivered the Opinion of the Court.

Plaintiffs and appellants, property owners who reside within the City of Billings and general contractors who do business within the City of Billings, brought this declaratory judgment action, seeking to strike down a funding system for the expansion of water and sewer facilities that was adopted by the City in 1985. Following submission of the case on stipulated facts and issues, the Thirteenth Judicial District Court, Yellowstone County, ruled in favor of the City, holding that the funding system was lawful. Plaintiffs appeal. We affirm.

The following issues are raised on appeal:

1. Whether §§ 7-1-111(5) and -113(1), MCA, preempt the City of Billings from implementing new utility fees under its self-governing powers.

2. Whether Montana statutes governing municipal utilities prohibit the City of Billings from collecting and accumulating system development fees for the purpose of funding a portion of the cost of future expansion of the water and sewer systems.

3. Whether the system development fee is a sales tax, the adoption of which is prohibited by § 7-1-112(1), MCA.

In April, 1985, the City of Billings, a municipal corporation with its own governmental charter, adopted a resolution that established a new system for funding the expansion of water and sewer facilities for the general benefit of the City. The new funding system called for the assessment of "system development

2

fees" upon customers who requested new water or wastewater services or an upgrade in existing water or wastewater services. The City implemented the funding method for the water facilities in 1985, however, it delayed implementing the funding system for the sewer facilities until 1989.

The fees are due and payable at the time the customer applies for the service; the City will not provide new or expanded water or wastewater services unless the fee is paid. The amount of the fee is based upon the size of the meter. Users of larger meters pay larger fees.

The fees are revenue-raising measures adopted to fund construction of new water and wastewater facilities needed to meet the demands placed on the existing facilities by new growth in the City. They are placed in a special fund, which is used solely for the construction of expansion-oriented, general-benefit water and wastewater facilities or for the retirement of bonds sold for such purpose. Once sufficient monies are accumulated to fund the proposed expansion facilities, bids are advertised and construction contracts awarded. The facilities built with the fees may or may not directly serve or accommodate expansion on the property from which the fees are derived.

In the stipulated facts submitted to the District Court, the parties agreed that the City used the following theory to justify the adoption of the fees:

> Existing customers should not be required to finance new capacity which does not benefit them, but instead benefits new applicants for water/wastewater service. That is, existing customers should not subsidize growth.

3

In order to address this concept, system development fees levied on all new applicants for service were adopted, and the revenue derived would be used to fund all or portions of new capacity provided by the utility.

Consequently, the purpose in levying system development fees on new water/wastewater applicants is to equalize the new applicant's user charge obligations with that of existing customers. The rationale used to equalize such user charges is as follows:

In order to serve new applicants with water/wastewater service, the City must maintain on hand a reasonable amount of water/wastewater system capacity over and above that needed to serve its current customers. This extra or reserve capacity is paid for by the City's current water/wastewater customers through their user charges.

As new applicants are connected to the water/wastewater system they are then allocated increments of capacity from this pool of reserve capacity. Consequently, in order to keep from emptying this pool of reserve capacity, the capacity allocated to new applicants must be timely replaced by the City. However, this reserve capacity must be replaced by the City at today's cost, which during inflationary times, can exceed the original cost of such capacity.

The City can recover these costs from new applicants by utilizing both user charges and system development fees. The original cost of the reserve capacity is recovered by the City from new applicants through their user charges, the same as it is recovered by the City from its current customers. The inflationary cost increment (today's cost - original cost) is recovered by means of a one-time, lump-sum fee called a system development fee which is levied on new applicants at the time of hookup. By recovering these costs in this manner, new applicants and current customers are placed on the same rate paying footing. In other words, their user charges are equalized.

Before the adoption of system development fees, customers of the water and sewer systems paid a portion of the construction costs of expansion facilities built to serve new growth by way of monthly rate charges. The expansion facilities did not always directly serve or accommodate the properties from which the funds

4

were derived. Since the adoption of the system development fees, both new and existing customers continue to pay the monthly user fees. The system development fees are levied on top of these monthly charges.

In addition to monthly user charges, the City previously funded and continues to fund improvements to and expansion of water and wastewater facilities through 1) revenue bonds; 2) grants from state and federal governments; 3) interest from utility investments; 4) SIDs assessed for the areas served by specific improvements or through which specific improvements have been constructed; and 5) privately financed construction by subdividers. The system development fees provide an additional source of funds to be used for the construction of expansion-oriented, general-benefit facilities.

Appellants filed this declaratory judgment action against the City on July 16, 1985. On January 22, 1988, the parties submitted a stipulation of basic facts to the District Court. They then filed simultaneous motions for summary judgment. After briefing, the District Court issued its opinion that the system development fees were lawful. Since the District Court opinion did not dispose of all issues, no appeal could be taken. Therefore, appellants amended the complaint to eliminate any issues not disposed of by the District Court. The court then entered judgment in favor of the City. This appeal followed.

I.

Whether §§ 7-1-111(5) and -113(1), MCA, preempt the City of

Billings from implementing new utility fees under its self-governing powers.

As a municipal corporation with its own governmental charter, the City of Billings is a self-governing unit that may exercise any power not prohibited by the Montana Constitution, state law or its own charter. Sec. 6, Art. XI, Mont. Const.; § 7-1-101, MCA. It may also provide any services or perform any functions not expressly prohibited by constitution, law or charter. Section 7-1-102, MCA. Its power and authority are to be liberally construed, with every reasonable doubt as to the existence of a power or authority resolved in favor of the power or authority's existence. Section 7-1-106, MCA.

State law can preempt a self-governing municipality from acting in a certain area only by express statutory prohibition. D & F Sanitation Serv. v. City of Billings, 219 Mont. 437, 445, 713 P.2d 977, 982 (1986). Appellants argue that two statutes expressly forbid the City from regulating municipal utilities. The first, § 7-1-111(5), MCA, provides as follows:

> A local government unit with self-government powers is prohibited the exercise of the following:
>
> . . .
>
> (5) any power that establishes a rate or price otherwise determined by a state agency.

Appellants contend that this statute preempts the field of municipal utility regulation because a state agency, the Public Service Commission (PSC), possesses the power to establish utility rates. While this argument may have had some validity prior to

6

1981, it is no longer valid.

Before 1981, the PSC was vested with full power of supervision, regulation and control of public utilities. In 1981, however, the legislature passed House Bill 765, entitled An Act to Provide for Municipal Regulation of Municipally Owned Utilities, ch. 607, 1981 Mont. Laws 1386, which added §§ 69-7-101 through -201, MCA, to the Montana Code. In the same bill, the legislature amended § 69-3-101(1)(e), MCA, to exclude municipal utilities from the definition of "public utility." The statute now reads as follows:

> (1) The term "public utility", within the meaning of this chapter, shall embrace every corporation, both public and private, company, individual, association of individuals, their lessees, trustees, or receivers appointed by any court whatsoever, that now or hereafter may own, operate, or control any plant or equipment, any part of a plant or equipment, or any water right within the state for the production, delivery, or furnishing for or to other persons, firms, associations, or corporations, private or municipal:
>
> . . .
>
> (e)   except as provided in chapter 7 [governing regulation of rates and operation of utilities by municipalities], water for business, manufacturing, household use, or sewerage service, whether within the limits or municipalities, towns, and villages or elsewhere. (Emphasis added.)

Section 69-3-101(1)(e), MCA.

Sections 69-7-101 through -201, MCA, as adopted in H.B. 765 placed control of municipal utilities in the hands of municipalities. Section 69-7-101, MCA, provides as follows:

> A municipality has the power and authority to regulate, establish, and change, as it considers proper, rates, charges, and classifications imposed for utility services to its inhabitants and other persons served by municipal

utility systems. Rates, charges, and classifications shall be reasonable and just, and, except as provided in 69-7-102, they may not be raised to yield more than a 12% increase in total annual revenues . . . .

Since the passage of H.B. 765, the PSC possesses the authority to review municipal utilities only if utility rate increases yield an increase in total revenues in excess of 12 percent in one year. Section 69-7-102, MCA. Pursuant to this requirement, the municipality must annually report utility rates to the PSC and the Montana Consumer Counsel. Section 69-7-121, MCA.

Other than the review of rate increases in excess of 12 percent per year, the PSC retains no regulatory authority over municipal utilities. If a municipality "considers it advisable to regulate, establish, or change rates, charges, or classifications . . ." it, not the PSC, is required to hold public hearings. Sections 69-7-111 and -112, MCA. Any interested party may appeal the decision of the municipality regarding utility rates or rules to the district court, not the PSC. Section 69-7-113, MCA.

In sum, H.B. 765 excluded municipal utilities from the definition of the term "public utility" and took regulatory control of municipal utilities out of the hands of the PSC and placed it in the hands of municipalities. The only authority retained by the PSC in this area is the review of rate increases that yield an increase in total revenues in excess of 12 percent in any one year.

The appellants' argument that the City is preempted from acting in the field of utility regulation by § 7-1-111(5), MCA, is without merit. Section 7-1-111(5), MCA, prohibits the City from exercising any power that establishes rates otherwise determined

8

by a state agency. As we have demonstrated above, however, municipal utility rates are not determined by a state agency. On the contrary, unless the rates result in an increase of total revenue of 12 percent in any one year, the exclusive authority to regulate, establish and change municipal utility rates rests with the City. Therefore, § 7-1-111(5), MCA, does not preempt the City from exercising its self-governing powers in the area of municipal utilities.

The other statute that appellants contend preempts the City from acting in the area of utility regulation is § 7-1-113(1), MCA, which provides:

> (1) A local government with self-government powers is prohibited the exercise of any power in a manner inconsistent with state law or administrative regulation <u>in any area affirmatively subjected by law to state regulation or control</u>. (Emphasis added.)

Appellants' argument ignores the remainder of the statute, which in subsection (3) defines when an area is "affirmatively subjected to state control."

> (3) An area is affirmatively subjected to state control if a state agency or officer is directed to establish administrative rules governing the matter or if enforcement of standards or requirements established by statute is vested in a state officer or agency.

Section 7-1-113(3), MCA.

The setting of rates and charges for municipal utilities has not been affirmatively subjected to state control within the meaning of § 7-1-113, MCA. The enforcement of any standards or requirements in the area of municipal rate making is not vested in any state agency or officer. Furthermore, no statute directs the

9

PSC or any other state agency or officer to establish administrative rules governing municipal utilities. In fact, § 69-7-201, MCA, requires the municipal utility, with the concurrence of the municipal governing body, to adopt rules for operating the utility.

The PSC itself has recognized that rule and rate-making authority over municipal utilities resides in the hands of municipalities. It has declared that its express policy is to decline jurisdiction over matters regarding municipally owned utilities unless the utility requests a rate increase that will yield an increase of over 12 percent in any one year. Sections 38.5.701 and .702, ARM.

The legislature has given the right to control municipal utilities, including the right to establish rates and charges, to municipalities. Sections 69-7-101 through -201, MCA. Section 7-1-113, MCA, does not preempt the City from exercising this right.

## II.

Whether Montana statutes governing municipal utilities prohibit the City of Billings from collecting and accumulating system development fees for the purpose of funding a portion of the cost of future expansion of the water and sewer systems.

As noted above, a self-governing municipality such as the City of Billings may exercise any power not expressly prohibited by the Montana Constitution, statutory law or its own charter. Sec. 6, Art. XI, Mont. Const.; § 7-1-101, MCA. Furthermore, a self-governing municipality's powers are to be liberally construed, and

10

all reasonable doubts regarding the existence of a municipality's power are to be resolved in favor of finding that the power exists. Section 7-1-106, MCA. Therefore, although Montana statutes do not specifically provide for the implementation of system development fees, we are compelled to liberally construe the City's power to institute such a fee system, resolving all reasonable doubts in favor of finding the existence of the power.

Montana statutes give municipalities the authority to acquire, construct and maintain various undertakings, including the authority to establish and maintain water and sewer systems. Sections 7-7-4404 and 7-13-4301, MCA. Statutory law also allows municipalities to "prescribe and collect rates, fees, and charges for the services, facilities, and commodities furnished by such undertaking." Section 7-7-4404, MCA. See also § 7-13-4304, MCA. The rates, fees and charges collected should produce sufficient revenue to pay bonds issued to finance the construction, improvements or extension of any undertaking and to "provide for all expenses of operation and maintenance of such undertaking, including reserves therefore." Section 7-7-4424, MCA. Considering the above statutes, we hold that the system development fee is a reasonable extension of the City's express statutory authority to operate and fund municipal water and sewer systems.

Appellants argue that the system development fee is unlawful because it violates certain statutes that require the fee to be equitable in proportion to the benefits received. For example, § 7-13-4304, MCA, provides:

(1) The governing body of a municipality operating a municipal water or sewer system shall fix and establish, by ordinance or resolution, and collect rates, rentals, and charges for the services, facilities and benefits directly or indirectly afforded by the system, taking into account services provided and benefits received.

(2) Sewer charges may take into consideration the quantity of sewage produced and its concentration and water pollution qualities in general and the cost of disposal of sewage and storm waters. The charges may be fixed on the basis of water consumption or any other equitable basis the governing body considers appropriate. The rates for charges may be fixed in advance or otherwise and shall be uniform for like services in all parts of the municipality. If the governing body determines that the sewage treatment or storm water disposal prevents pollution of sources of water supply, the sewer charges may be established as a surcharge on the water bills of water consumers or on any other equitable basis of measuring the use and benefits of the facilities and services.

(3) An original charge for the connecting sewerline between the lot line and the sewer main may be assessed when the connecting sewerline is installed.

(4) The water and sewer rates, charges, or rentals shall be as nearly as possible equitable in proportion to the services and benefits rendered. (Emphasis added.)

Appellants argue that the system development fee is not equitable in proportion to the benefits received because a customer using an older utility asset ends up paying more than one using a newer asset. Appellants reach this conclusion by misinterpreting the formula used to arrive at the system development fee.

As the City points out, the system development fee system is not designed to recover the costs of facilities that already exist nor is it designed to recover the costs of replacing existing facilities. Both of these costs are paid by existing customers through their monthly user charges. Once new applicants connect to the water and sewer systems, they become existing customers and

12

are also subject to monthly user charges. System development fees, unlike monthly user charges, are used exclusively to pay a portion of the inflationary costs of constructing new facilities needed to replace units of capacity used up by new customers hooking into the system.

Appellants also argue that the fee violates Montana law because the property owned by the new customer forced to pay the fee may not be directly benefited by the system. Once again, appellants misunderstand the purpose of the fee.

A new customer who chooses to hook up to the City's water and sewer systems receives the benefit of the reserve capacity in those systems. Once the new customers use up the existing capacity, the City will be forced to construct additional facilities to serve new applicants. Prior to the implementation of the system development fee funding system, a portion of the cost of such expansion facilities was raised through revenue bonds. The revenue bonds were paid with money raised from monthly user charges. Thus, existing users of the systems were charged a portion of the costs of building expansion facilities that were of no direct benefit to them.

System development fees are no different in this respect than monthly user charges. In both cases, properties not directly benefited by certain improvements are paying for those improvements. The need for expansion facilities is directly related to the new users coming onto the systems. If there were no new applicants for service, there would be no need for

additional facilities. System development fees are thus designed to place a greater share of the cost of meeting that need on those persons creating the need.

Furthermore, Montana law does not prohibit a municipality from establishing rates and charges for water and sewer systems simply because the benefit from the system does not directly benefit the customer charged. Section 7-13-4304, MCA, allows a municipality to establish and "collect rates, rentals, and charges for the services, facilities, and benefits <u>directly or indirectly</u> afforded by the system, taking into account services provided and benefits received." As pointed out by the discussion above, new users of the City's water and sewer systems are indirectly if not directly benefited by the construction of new facilities when the reserve capacity of existing facilities is exhausted. The system development fee is a reasonable response to the demand placed on the City's water and sewer systems by the growth of the area.

Several other jurisdictions have upheld similar methods of funding the expansion of water and sewer systems to meet the additional demands on those systems created by new users. Meglino v. Township Comm. of Eagleswood, 510 A.2d 1134 (N.J. 1986); Loup-Miller Constr. Co. v. City and County of Denver, 676 P.2d 1170 (Colo. 1984); Coulter v. City of Rawlins, 662 P.2d 888 (Wyo. 1983); Home Builders Ass'n of Greater Salt Lake v. Provo City, 503 P.2d 451 (Utah 1972); Hayes v. City of Albany, 490 P.2d 1018 (Or. Ct. App. 1971). As noted by the Florida Supreme Court:

> Raising expansion capital by setting connection charges, which do not exceed a <u>pro rata</u> share of reasonably

anticipated costs of expansion, is permissible where expansion is reasonably required, if use of the money collected is limited to meeting the costs of expansion. Users "who benefit especially, not from maintenance of the system, but by the extension of the system . . . should bear the cost of that extension." (Emphasis in original.)

Contractors and Builders Ass'n of Pinellas County v. City of Dunedin, 329 So.2d 314, 320 (Fla. 1976) (quoting Hartman v. Aurora Sanitary Dist., 177 N.E.2d 214, 218 (Ill. 1961)).

The system development fee imposed by the City of Billings meets the basic criteria outlined in the cited cases. First, the fee is based on reasonably anticipated future costs of the City. Second, the revenue generated from the fees is used solely for the purpose of funding the expansion of water and sewer facilities or for paying bonds sold for such purposes. We therefore hold that the system development fee is a reasonable exercise of the City's self-governing powers.

## III.

Whether the system development fee is a sales tax, the adoption of which is prohibited by § 7-1-112(1), MCA.

Self-governing municipalities are expressly prohibited from levying income or sales taxes without specific authorization from the legislature. Section 7-1-112(1), MCA, provides as follows:

A local government with self-government powers is prohibited the exercise of the following powers unless the power is specifically delegated by law:

(1) the power to authorize a tax on income or the sale of goods or services, except that this section shall not be construed to limit the authority of a local government to levy any other tax or establish the rate of any other tax.

15

Appellants argue that the system development fee adopted by the City constitutes an unlawful sales tax and, as such, must be struck down by this Court.

In State ex rel. Malott v. Board of County Comm'rs of Cascade County, 89 Mont. 37, 83, 296 P. 1, 14 (1931), we discussed the difference between a tax and an assessment, stating:

> While the two terms (taxes and assessments) are sometimes used synonymously, there is a well recognized distinction between them. A tax is levied for the general public good, and without special regard to the benefit conferred upon the individual or property subject thereto, while a special assessment is levied to force payment for a benefit equal in value to the amount thereof. The latter (assessment) is not a tax of all the property within a district for general purposes, founded upon the benefits supposed to be derived from the organization of a government, but is a charge upon specific property for a specific purpose, founded upon the benefits supposed to be derived by the property itself. (Parentheticals in original.)

The system development fee imposed by the City is neither a tax nor an assessment as those terms are defined in Malott. The fee is not an assessment because it is not levied to force payment for a special improvement to a specific piece of property whose value has been enhanced by that improvement. It is the occupier of the property, not the property itself, who benefits from the expansion of the City's water and sewer systems. Nor is the fee a tax levied for the general public good. Rather, the fee is imposed for the benefit of new users of the water and sewer facilities whose use of these systems gives rise to the need for the additional water and sewer capacity.

In Montana Innkeepers Ass'n v. City of Billings, 206 Mont. 425, 671 P.2d 21 (1983), this Court struck down a hotel-motel bed

16

tax imposed by the City, holding that such a "fee" was directly connected to the renting of rooms and was therefore a sales tax prohibited by § 7-1-112(1), MCA. The tax in Innkeepers can be distinguished from the system development fee in this case. In that case, the District Court found and appellants did not contest that the tax was not tied to any regulatory activity. The system development fee in this case, however, is directly related to the City's authority to regulate municipal utilities. Other jurisdictions have determined that similar fees are not taxes or assessments but are more in the nature of service fees or user charges. These jurisdictions have held that the fees are not taxes as long as 1) they are not placed in a general revenue fund; and 2) there is a reasonable relationship between the fees and the uses to which they are put. Hayes, 490 P.2d 1020; Home Builders Ass'n, 503 P.2d at 452.

In the present case, the system development fees are not held in a general revenue fund to be used on projects totally unrelated to the City's water and sewer systems. Instead, the fees are placed in a special fund earmarked for expanding the City's water and sewer facilities or for retiring bonds issued for that purpose. Thus, the fees are not taxes but are service charges, which the City is not prohibited from adopting by § 7-1-112(1), MCA.

Affirmed.

_William E. Hunt Sr._
Justice

We Concur:

_J. A. Turnage_
Chief Justice

17

_John Conway Harrison_

_John L. Sheehy_

_Diane G. B_

_R. C. McDonough_

_Fred J. Haber_

Justices